# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

MICHAEL B. REED
and JAMES ENGLAND, JR.,

        Plaintiffs,

v.

UNITED STATES OF AMERICA,

        Defendant.

No. 3:18–cv–00201–TWP–DCP
Hons. Phillips/Poplin

## DEFENDANT UNITED STATES OF AMERICA'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

BACKGROUND ................................................................................................... 2

    A.    The Chimney Tops 2 Fire .......................................................... 2

    B.    National Park Service Wildfire Management Policies .................................. 8

SUMMARY OF CLAIMS ................................................................................... 11

STANDARD OF REVIEW ................................................................................. 12

ARGUMENT ...................................................................................................... 13

    A.    Overview of the Discretionary Function Exception .................................... 13

    B.    The National Park Service's Firefighting Activities Are Protected By The Discretionary Function Exception .............................................. 15

        1.    The First Prong of the *Gaubert* Test ..................................... 17

           a.    The Policies Cited By Plaintiffs Do Not Constrain The Park Service's Discretion In Suppressing Wildfires ................. 20

           b.    The Policy Provisions Cited By Plaintiffs, Even If Mandatory, Are Not Sufficiently Specific To Defeat The Discretionary Function Exception ............... 24

               i.    Count One—Failure to Monitor .......................... 25

               ii.    Count Two—Failure to Comply with Command-Structure Requirements ......... 27

               iii.    Count Three—Failure to Adhere to Mandatory Fire Management Policies and Requirements ................. 32

               iv.    Count Four—Failure to Warn ........................ 38

        2.    The Second Prong of the *Gaubert* Test .................................... 40

CONCLUSION.................................................................................................... 45

# INTRODUCTION

Plaintiffs Michael Reed and James England bring this action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2671-2680, seeking damages from loss of their family members and destruction of property as a result of a wildfire in the Great Smoky Mountains National Park in November 2016 (hereinafter, "the Chimney Tops 2 Fire").

This Court lacks subject matter jurisdiction because this action is barred in its entirety by the discretionary function exception to the FTCA, 28 U.S.C. § 2680(a). How to fight wildfires entails the exercise of discretion by the National Park Service ("NPS" or "Park Service") that involves considerations of policy. The discretionary function exception to the FTCA therefore shields from liability decisions made by the Park Service during its wildfire suppression efforts. Indeed, which firefighting strategies and tactics to employ, when and how to allocate personnel and resources, and how to warn of a wildfire's danger—the types of decisions that are made in the course of every fire suppression—are classic discretionary judgments that courts traditionally have refused to second-guess.

Even assuming that the Park Service was negligent in battling the Chimney Tops 2 Fire (it was not), the discretionary function exception applies. This is so because the discretionary function exception protects the Park Service's wildfire suppression decisions, including those based on flawed information, and therefore bars Plaintiffs' claims regardless of whether the Park Service's firefighting activities were negligently performed.

Solely for purposes of this motion, this Court may assume that the concededly catastrophic losses suffered by Plaintiffs were preventable—if only the Park Service had employed different firefighting strategies or tactics, if only it had devoted additional personnel and resources to the fire response, or if only it had better coordinated its efforts with state and

1

local firefighting partners.  In enacting the discretionary function exception, however, Congress made clear that courts may not use FTCA lawsuits to revisit such policy-based judgment calls by federal agencies.  This action therefore must be dismissed in its entirety.

## BACKGROUND[1]

### A.    The Chimney Tops 2 Fire

As darkness approached in the early evening of Wednesday, November 23, 2016, the day before Thanksgiving, a fire was discovered on the north spire of the Chimney Tops, a steep 4,800 foot hill in the Great Smoky Mountains National Park (hereinafter, "The Chimney Tops 2 Fire").  Complaint ("Compl.") ¶ 95.   The Chimney Tops area is approximately five and one half miles south of the city of Gatlinburg.  *Id*.  The fire was detected by NPS Fire Management Officer ("FMO") Greg Salansky.  *Id*. ¶ 96.  Salansky surveyed the area and found that the fire was located amongst very dense vegetation near the peak of Chimney Tops Trail.  *Id*.  That area of steep and rocky terrain had been closed to the public since August 1994, after a teenager fell more than 350 feet to his death.  *Id*.

Another NPS firefighter stayed back, deciding it was unsafe to continue, but Salansky looked for ways to contain the fire as it burned under thick duff.  *Id*. ¶ 97.  He used a small hand-tool to brush away enough leaves and duff to start a fire-line, but relented after his efforts had little effect.  *Id*.[2] Salansky determined that a direct attack on the fire at that time would be too

---

[1] For purposes of this motion to dismiss, the United States assumes the truth of Plaintiffs' factual allegations and asserts legal arguments as to why the United States possesses sovereign immunity and thus there is no subject matter jurisdiction.  Plaintiffs' Complaint cites extensively to and relies on agency policies as well as the Park Service's Fire Review Report, which were attached to the Complaint as Exhibits 3-10 (ECF Nos. 1-5–2-3).  Citations in this motion are to the ECF page numbers of the referenced policies.

[2] A fire-line is a break in fuels created by removing all vegetation up to an existing barrier, such as bare mineral soil; a natural feature (such as a rock outcrop, creek, or other body of water); or a constructed surface (such as a road or driveway).  *Id*. ¶ 97, n.45.

dangerous for firefighters because of the fire's location amongst the very dense vegetation and vertical, rocky terrain. *Id*.[3]  At the time, the fire was less than an acre in size and slow-moving. *Id*. ¶¶ 15, 99.  Before leaving for the night, Salansky closed Chimney Tops Trail to protect the public. *Id*. ¶ 99.  Moreover, the Park Service issued a press release, describing the Chimney Tops 2 Fire as approximately one and a half acres in size with slow rates of spread, smoldering in a location approximately a quarter of a mile from the Chimney Tops 1 Fire, and located in extremely remote, steep, and inaccessible terrain. *Id*. ¶ 383.  The press release further informed the public that area trail closures were implemented. *Id*.

At about 8:00 a.m. on Thursday, November 24, Thanksgiving Day, Salansky and one other firefighter hiked up to the top of the Chimney Tops, past the area closed to the public. *Id*. ¶¶ 127-128.  Three other firefighters refused to climb because they considered it unsafe. *Id*. ¶ 128.  Salansky observed that the fire had not grown much from the previous night. *Id*.  Winds were calm, and the area had received a small amount of rain overnight. *Id*.  Salansky considered a water-attack by air, but he was concerned about potentially polluting the environment and the drinking water supply downstream. *Id*. ¶ 126.  Thus, after considering the fire's hazardous location and small size, Salanksy began planning an indirect attack due to the inability to do a direct attack safely and effectively. *Id*. ¶ 129.

By mid-day on Friday, November 25, 2016, the fire was still small in size— approximately two acres—and located on the northeast side of the Chimney Tops. *Id*. ¶ 135. The Park Service again determined that the topography was too dangerous for a direct attack. *Id*.

_____

[3] A direct attack is treatment applied directly to a fire, such as wetting, smothering, or chemically quenching the fire or by physically separating the burning from unburned fuel.  An indirect attack is a tactic or strategy used at a distance from the fire, including fuel reduction, indirect or contingency fire-lines, planned ignitions, and wetting unburnt fuels. *Id*.

3

FMO Salansky, Chief Ranger Steve Kloster, and Deputy Superintendent Clayton Jordan devised a plan to hold the fire within a 410-acre "containment box." *Id.* ¶¶ 16, 130, 137. The containment box was delineated on paper using topographic/natural barriers and relying on natural drainages, Newfound Gap Road, and trails to contain the fire. *Id.* ¶ 138. NPS firefighters scouted the box's perimeter, which consisted of trails, streams, drainage bottoms, and other natural features, as well as roads and other man-made barriers, including lines dug by the firefighting team. *Id.* ¶¶ 138, 142. Salansky believed, based on historical fire behavior in the Park and a forecast for rain on Monday, that the fire would never reach the perimeter of the box. *Id.* ¶ 138. The Park Service issued a press release on November 25, 2016, describing the fire and informing the public of fire suppression efforts. *Id.* ¶ 384.

A weather report issued on Saturday morning, November 26, predicted rain and stronger winds in the area starting Sunday and continuing into Monday. *Id.* ¶ 146. At approximately 8:00 a.m. on Saturday, Salansky briefed eight firefighters and sent three of them to scout for fire-line construction points. *Id.* ¶ 149. Salansky and the other five firefighters hiked out to the Chimney Tops. *Id.* There, they determined that the fire remained relatively small—approximately 6-8 acres in size—and confined to the area near the Chimney Tops. *Id.* ¶¶ 99, 149. Salansky believed that they could still catch and hold the fire using the containment strategy of natural and human-made features. *Id.* ¶ 151.

On Sunday morning, November 27, Salansky hiked to the top of the Chimney Tops to survey the fire. He determined that it had become more active overnight. *Id.* ¶ 162. Salansky thus sent three firefighters to the Chimney Tops to gather further information regarding the fire's size, location, and behavior. *Id.* Salansky returned to Park headquarters and began ordering additional inter-agency ground and aerial fire assets to combat the blaze, including one helicopter

4

capable of bucket drops, two helitankers, an air-attack fixed wing aircraft, and a wildland fire module, consisting of 7-10 people fully capable of being inserted into the fire. *Id.* ¶ 162, n.143.

Reinforcements from National Guard hangars in Chattanooga arrived. *Id.* ¶ 166. As crews scraped fire-lines in the ravines below, a Chinook Type 1 helicopter – the largest helicopter for use on wildfires – arrived at approximately 1:00 p.m. and began pulling water from the Pigeon River's West Prong and dropping it onto the fire. *Id.* The first helicopter dropped 26,000 gallons of water onto the fire, working until it had to refuel. *Id.* Two smaller helitankers arrived at approximately 3:00 p.m., and delivered three drops of 1,000 gallons each. *Id.* Salansky's objective for the water drops was to prevent the fire from backing down the slope into the area southwest of the Chimney Tops. *Id.* ¶ 168.

At approximately 4:30 p.m. on Sunday, dwindling daylight terminated the air attack. *Id.* Salansky considered whether to have an air-tanker drop flame retardant on the fire, but decided against it as the river below was the water source for Gatlinburg. *Id* ¶ 169.[4]

Salansky's plan for Monday was to again use firefighters and engines to build containment lines using the drainages and any wet areas they found to control the spread of the fire, remove the leaf-litter from the surface, and move as far up the mountain as they could. *Id.* ¶ 173. He also intended to use aviation resources to attack the western edges of the fire to prevent its spread down into the Chimneys Picnic area. *Id.*

From Sunday night into Monday, November 28, the weather changed dramatically. *Id.* ¶ 182. A weather formation known as a "mountain wave" brought winds up over the Chimney Tops. *Id.* ¶¶ 147, 182. During this extreme weather event, winds driven by a low-pressure

---

[4] An 8-person module of Type 2 wildland firefighters arrived at approximately 7:00 p.m. on Sunday. *Id.* ¶ 171. Salansky took them to the lookout point off Newfound Gap Road, where they saw little to worry about. *Id.*

5

system of air blow from the south, picking up momentum as the gusts crest the mountaintops.  At around 5,000 feet, the currents crash down the mountain slopes like an invisible avalanche.  *Id.* ¶ 147.

When firefighters returned at sunrise on Monday, November 28, they discovered that the intensity and rate of speed of the fire had radically increased.  *Id.* ¶ 184.  Overnight, southerly winds had carried embers from the Chimney Tops area.  *Id.* ¶ 185.  A 50-acre spot fire was discovered more than one mile away.  *Id.*  At this point, Salansky estimated that the fire had grown to 250-500 acres.  Accordingly, Salansky, Deputy Superintendent Jordan, Chief Ranger Kloster, and Chief of Resource Management and Science Jeff Troutman convened at the Chimney Tops Picnic Area to evaluate the situation.  *Id.* ¶ 186.

Salansky immediately began ordering a large number of firefighting crews, air resources, and a complex fire incident management team ("IMT").  *Id.* ¶¶ 186-187, 209-216.  Salansky contacted the Tennessee Interagency Coordination Center ("TICC") and requested 20-person fire crews and a Type 2 IMT.  *Id.* ¶ 187.  He also requested Type 1 Hotshot Crews.  *Id.*  Moreover, Salansky ordered a Type 3 IMT that was in Johnson City, Tennessee that could arrive by 6:00 p.m.  *Id.*  By Monday morning, the wind and low visibility caused by smoke made it impossible to fly aircraft over the Chimney Tops 2 Fire.  *Id.* ¶ 188.

At approximately 10:00 a.m. on Monday, the Park Service issued another press release, describing how the fire had grown to approximately 500 acres, spot fires had been detected around the Chimneys Picnic area and Bullhead Ridge, and suppression efforts were taking place.  *Id.* ¶ 385.  The release also identified trail and road closures, and stated that additional fire-suppression resources were being ordered due to the fire's size and predicted increased winds.  *Id.*

6

At approximately 11:00 a.m. on Monday, Salansky spoke with Gatlinburg Fire Department ("GFD") Chief Greg Miller, explaining that smoke was originating from the Chimney Tops 2 Fire and the smoke had the potential to travel to the city. *Id.* ¶ 194. Fire was next reported in the Twin Creeks area of the Park, more than a mile north of Bullhead Ridge, closer to the city of Gatlinburg. *Id.* ¶¶ 201-02. Chief Ranger Kloster contacted GFD Chief Miller and told him that he and Park Superintendent Cassius Cash were en route to the Gatlinburg Fire Department to brief them. *Id.* ¶ 203. Salansky also moved fire engines and the 8-person module to Twin Creeks, and called local agencies with wildland fire units for more help. *Id.* ¶ 204. Shortly thereafter, Salansky also requested manpower and resources from the Gatlinburg Fire Department. *Id.* ¶ 205. The Sevier County Wildland Task Force also was activated. *Id* ¶ 206.

At approximately noon, GFD first responders began delivering voluntary evacuation notices in Mynatt Park, an area within the city of Gatlinburg. *Id.* ¶ 211. Park Superintendent Cash met with Gatlinburg, Pigeon Forge, and Sevier County officials to advise them that the fire was out of control, winds may cause the fire to spread to their communities, and the Park was evacuating everyone. *Id.* ¶ 208. He recommended that the local officials evacuate their communities as well. *Id.* After the meeting, Salansky requested a 15-person fire crew from the Cherokee National Forest and another engine that was a few hours away. *Id.* ¶ 209. Manpower and resources from the Sevierville Fire Department and the Pigeon Forge Fire Department also were requested. *Id.*

Despite the efforts of Park Service and local firefighting personnel, by approximately 3:00 p.m. on Monday, the Chimney Tops 2 Fire was moving closer to the Park boundary at Twin Creeks. *Id.* ¶ 220. At that point, the fire had ignited about 2,000 acres. *Id.* Just ten minutes

7

later, crews fighting at Twin Creeks reported that the fire was racing up a nearby ridge toward the Park Vista Hotel, a 16-story, 300-room hotel just outside the Park near Mynatt Park. *Id*. ¶ 221. By 4:15 p.m., the fire was within one mile of the Mynatt Park area. Id. ¶ 222. The blanket of smoke covering Gatlinburg and Sevier County made air reconnaissance impossible. *Id*. ¶ 223.

By approximately 6:00 p.m., the fire had reached the Park boundary and crossed into the city of Gatlinburg. *Id.* ¶ 229. Thereafter, multiple fires were reported throughout the city, resulting in property damage, personal injury, and, most tragically, the deaths of more than a dozen residents. *Id*. ¶¶ 3, 229.

**B.      National Park Service Wildfire Management Policies**

Management of the National Park Service is governed by various public laws, regulations, and agency policies. Documents providing guidance for Park Service management fall under a three-tier system. *See* Management Policies 2006, attached as Ex. 9 to Compl., ECF 3-1 at 14. Management Policies 2006 is the "highest of three levels of guidance documents" in the Park Service system. *Id*. Management Policies 2006 establishes Park Service policy and guidance with respect to various foundational aspects of park management, including park system planning, land protection, wildlife preservation and management, and resource management. *Id*. at 5-9.

At Section 4.5, *Fire Management*, Management Policies 2006 addresses Park Service fire management and the establishment of fire management plans on a park-by-park basis. *Id*. at 59-60. According to Management Policies 2006, "[a]ll wildland fires will be effectively managed through application of the appropriate strategic and tactical management options as guided by the park's fire management plan. These options will be selected after comprehensive consideration of the resource values to be protected, firefighter and public safety, costs, availability of

8

firefighting resources, weather, and fuel conditions." *Id*. at 60. Management Policies 2006 also

provides, "[m]ore details on wildland fire management, including interagency and Department of

the Interior policies and requirements, are contained in Director's Order #18: Wildland Fire

Management." *Id*.

Director's Order #18 ("DO 18") "states the basic principles and strategic guidelines

governing the management of wildland fire by the National Park Service (NPS)." DO 18, ECF

2-1 at 1. The purpose of DO 18 is to:

> A. Emphasize firefighter and public safety as the first priority in every
> fire management activity.
> B. Establish a framework by which the NPS will institutionalize and
> implement principles, policies, organizational and operational
> relationships, and changes in law and reporting requirements.
> C. Provide a course of action for developing a cooperative, effective, and
> efficient approach for the preparation, response to, and recovery from
> wildfire incidents, regardless of cause, size, or complexity.

*Id*. at 2.

Reference Manual 18 ("RM 18") is issued by the Associate Director, Visitor and

Resource Protection, and "is a technical expression of background information, standardized

definitions, agency requirements, standards, and procedures for implementing Director's Order

#18." *Id*. at 3. It "represents the most detailed and comprehensive guidance on implementing

Service-wide wildland fire management policy for the National Park Service (NPS)." RM 18,

ECF No. 5-1 at 2. Additionally, RM 18 provides that "[s]upplemental policy regarding

coordination and responsibilities for wildland fire operations is found in the *Interagency*

*Standards for Fire and Fire Aviation Operations*." *Id*. at 5. The Interagency Standards for Fire

and Fire Aviation Operations handbook is commonly referred to as the Redbook ("Redbook"), due to the color of its cover.  Compl. ¶ 108.[5]

The Redbook, which is authored by interagency elements of the Interagency Standards for Fire and Fire Aviation Operations Group ("ISOG"), provides policy guidance for several federal agencies, including the National Park Service, Bureau of Land Management, U.S. Forest Service, and U.S. Fish and Wildlife Service.  2016 Redbook, Ex. 1 to United States' Motion to Dismiss ("MTD"), at 5.  For the National Park Service, the Redbook "supplements Reference Manual 18."  *Id*. at 6.

DO 18 requires each park with burnable vegetation to have an approved fire management plan that "will address the need for adequate funding and staffing to support its fire management program."  DO 18, ECF 2-1 at 3.  The Great Smoky Mountains National Park's fire management plan ("Fire Management Plan" or "FMP") "outlines a comprehensive fire program including wildland fire response, fire prevention and fuels management utilizing prescribed fire and mechanical treatments" in the park.  Fire Management Plan, ECF 1-7 at 5.

The Park Service also has issued a Fire Monitoring Handbook ("FMH") that allows the agency "to document basic information, to detect trends, and to ensure that each park meets its fire and resource management objectives."  FMH, ECF No. 2-3 at 3.  According to the FMH, from "identified trends, park staff can articulate concerns, develop hypotheses, and identify specific research studies to develop solutions to problems."  *Id*.  Thus, the FMH "is intended to

---

[5] Plaintiffs cited to and attached the 2017 Redbook as Exhibit 7 to their Complaint.  ECF 2-2.  However, it was the 2016 Redbook, not the 2017 version, which was in effect at the time of the Chimney Tops 2 Fire in November 2016.  Thus, the United States' references herein are to the 2016 Redbook, which is attached as Exhibit 1 to the United States' Motion to Dismiss.  The 2016 Redbook is publicly available at https://www.nifc.gov/policies/pol_ref_redbook_2016.html.

facilitate and standardize monitoring for National Park Service units that are subject to burning by wildland or prescribed fire." *Id*.

## SUMMARY OF CLAIMS

Plaintiffs' Complaint alleges six claims: four negligence claims, one wrongful death claim, and one loss of consortium claim.

In Count One, for negligence, Plaintiffs contend that the Park Service failed to conduct "overnight monitoring of fire-activity or smoke-impacts of any kind." Compl. ¶ 305. According to Plaintiffs, "[a]lthough overnight monitoring may not be required for every wildfire," *id*. ¶ 308, "[p]roper monitoring of fire-behavior and spotting, at least during the overnight hours on Sunday, November 27 to Monday, November 28, 2016" would have provided "more time" for Park Service officials to "recognize" that the Chimney Tops 2 Fire was "most likely going to impact Gatlinburg and the surrounding area and to then notify Park neighbors, local officials, local residents, and visitors." *Id*. ¶ 306.

In Count Two, for negligence, Plaintiffs allege that the Park Service violated "command-structure requirements." Compl. ¶ 321. In particular, according to Plaintiffs, "[FMO] Salansky wore too many hats" and his "invalid assumption of multiple command functions led directly to a lack of policy oversight, which, in turn, led to slipshod decisions throughout the fire" regarding the Park Service's suppression efforts and notifications and warnings. *Id*. ¶ 325.

In Count Three, for negligence, Plaintiffs allege that the Park Service (1) failed to timely perform a complexity assessment, *id.* ¶¶ 335-336; (2) improperly implemented a 410-acre containment box, *id*. ¶ 343; (3) failed to adopt contingency plans, *id*. ¶ 346; (4) disregarded fire-behavior modeling and a weather forecast, *id*. ¶¶ 347-350; (5) failed to utilize air operations to suppress the fire, *id*. ¶¶ 351-353; (6) failed to implement a "universal communications system,"

11

*id.* ¶¶ 354-358; and (7) neglected to utilize the Wildland Fire Document Support System (WFDSS) "to guide the ongoing effectiveness and re-evaluation of suppression-strategies." *Id.* ¶ 362.

In Count Four, for negligence, Plaintiffs allege that the Park Service failed to provide "timely notice" to "residents, public and/or local fire agencies" of the risk of the Chimney Tops 2 Fire "expanding into their communities" such that they could have taken "precautionary actions," such as evacuation, "removing their most valuable property to a safer location," and "preparing their properties for lower fire spread risk." *Id.* ¶ 398.

In Count Five, for wrongful death, Plaintiff Michael Reed alleges that Park Service employees' negligent acts or omissions during the Chimney Tops 2 Fire proximately caused the wrongful death of his wife and two daughters. *Id.* ¶ 408.

In Count Six, for loss of society and consortium, Plaintiff Michael Reed alleges that because of the Park Service employees' negligent acts or omissions he has "lost the services, companionship, consortium and society of his wife and children." *Id.* ¶ 410.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(1) "provides for the dismissal of an action for lack of subject matter jurisdiction." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014). A Rule 12(b)(1) motion for lack of subject matter jurisdiction can challenge the sufficiency of the pleading itself (a facial attack) or the factual existence of subject matter jurisdiction (a factual attack). *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). A facial attack goes to the question whether the plaintiff has alleged a basis for subject matter jurisdiction, and the court presumes the allegations of the complaint as true for purposes of the Rule 12(b)(1) analysis. *Cartwright*, 751 F.3d at 759; *Abbott v. Michigan*, 474 F.3d 324, 328 (6th Cir. 2007). A factual

attack challenges the factual existence of subject matter jurisdiction. *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430 (6th Cir. 2012). In the case of a factual attack, a court has broad discretion with respect to what evidence to consider in deciding whether subject matter jurisdiction exists, including evidence outside of the pleadings, and has the power to weigh the evidence and determine the effect of that evidence on the court's authority to hear the case. *Cartwright*, 751 F.3d at 759-60; *Hatcher v. United States*, 855 F. Supp. 2d 728, 731 (E.D. Tenn. 2012), *aff'd,* 512 F. App'x 527 (6th Cir. 2013).

In the United States Court of Appeals for the Sixth Circuit, a plaintiff can invoke jurisdiction under the FTCA "only if the complaint is facially outside the exceptions" set forth in the FTCA. *Carlyle v. Dept. of the Army*, 674 F.2d 554, 556 (6th Cir. 1982); *see also Sharp v. United States*, 401 F.3d 440, 443 n.1 (6th Cir. 2005); *United States v. Gaubert*, 499 U.S. 315, 324-25 (1991). The burden is on the plaintiff to plead sufficiently to demonstrate that his claim does not "clearly fall within" the discretionary function exception. *Carlyle*, 674 F.2d at 556.

<u>**ARGUMENT**</u>

**PLAINTIFFS' CLAIMS ARE BARRED BY THE DISCRETIONARY FUNCTION EXCEPTION**

### A. Overview of the Discretionary Function Exception

The United States is immune from liability absent its consent, and the terms of that consent define a court's jurisdiction to entertain a suit against the United States. *See United States v. Mitchell*, 445 U.S. 535, 538 (1980). Absent a specific waiver, sovereign immunity bars a suit against the federal government for lack of subject matter jurisdiction. *See FDIC v. Meyer*, 510 U.S. 471, 475-76 (1994).

The FTCA is a limited waiver of sovereign immunity that authorizes suits against the United States for:

money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). The FTCA's waiver of sovereign immunity is subject to several exceptions set forth in 28 U.S.C. § 2680, which "are designed to protect certain important government functions and prerogatives from disruption." *Molzof v. United States*, 502 U.S. 301, 311 (1992). Among these exceptions is the discretionary function exception, which bars "any claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

The Supreme Court has created a two-prong test for determining whether a claim is barred by the discretionary function exception. First, the court must determine whether the act "involv[es] an element of judgment or choice." *Gaubert*, 499 U.S. at 322. Pursuant to the first prong, the court looks to whether "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow . . . ." *Id.* (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)).

Second, if the conduct does involve judgment or choice, the court looks to "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322-23 (quoting *Berkovitz*, 486 U.S. at 536). "The basis for the discretionary function exception was Congress' desire to 'prevent judicial second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Berkovitz*, 486 U.S. at 536-37 (quoting *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984)). Thus, the exception protects "governmental actions

14

and decisions based on considerations of public policy." *Gaubert*, 499 U.S. at 323 (quoting *Berkovitz*, 486 U.S. at 537); *see also Abdulwali v. WMATA*, 315 F.3d 302, 304 (D.C. Cir. 2003) ("Discretionary functions are those governmental actions and decisions, 'based on considerations of public policy' and requiring 'an element of judgment or choice.'" (quoting *Berkovitz*, 486 U.S. at 536-37)).

It is immaterial whether various policy considerations *actually* were considered, because "[t]he focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are *susceptible to policy analysis*." *Gaubert*, 499 U.S. at 325 (emphasis added); *Rosebush*, 119 F.3d 438, 443 (6th Cir. 1997). Furthermore, "[w]hen established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be *presumed* that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324 (emphasis added).

The discretionary function exception applies even if the government's conduct was negligent or an abuse of discretion. *Gaubert*, 499 U.S. at 323; *Rosebush*, 119 F.3d at 442; *Hatcher*, 855 F. Supp. 2d at 732 ("The existence of negligence is irrelevant when determining whether the discretionary function exception applies.").

**B.   The National Park Service's Firefighting Activities Are Protected By The Discretionary Function Exception**

In determining whether Plaintiffs' claims fall within the discretionary function exception, "the crucial first step is to determine exactly what conduct is at issue." *Rosebush*, 119 F.3d at 441. Here, Plaintiffs' lawsuit is based upon the Park Service's alleged negligence in fighting the Chimney Tops 2 Fire. Plaintiffs' claims of negligence encompass the Park Service's firefighting

strategies and tactics, its allocation of personnel and resources to the fire suppression efforts, and its notifications and warnings of the fire's potential danger.

It is widely recognized that a federal agency's firefighting activities fall within the discretionary function exception to the FTCA. *See, e.g.*, *Miller v. United States*, 163 F.3d 591 (9th Cir. 1998) (discretionary function exception applied to claims for property damage as a result of forest fire spreading from national forest to ranch); *Backfire 2000 v. United States*, 273 F. App'x 661 (9th Cir. 2008) (discretionary function exception applied to Forest Service's decision to set backfires while combating a wildfire); *Luther v. United States*, No. 2:11-cv-268, 2014 WL 1255292 (D. Utah. March 26, 2014) (discretionary function applied to Forest Service's alleged negligence in suppressing lightning-caused wildfire that caused damage to neighbor's property); *McDougal v. U.S. Forest Service*, 195 F. Supp. 2d 1229 (D. Or. 2002) (discretionary function exception protected Forest Service's decisions regarding wildfire suppression); *Parsons v. United States*, 811 F. Supp. 1411 (E.D. Cal. 1992) (discretionary function exception applied to Forest Service employees' alleged negligence while fighting forest fire that destroyed 500 acres of plaintiffs' timber). A district court in this Circuit aptly observed:

> In fire protection and fire fighting, the situation faced . . . can vary widely depending on changing weather conditions, availability of personnel, availability of equipment, the condition of the forest, the presence of buildings, and probably other factors as well. . . . [P]ersonnel need to be free to make timely fire fighting decisions to deal with changing conditions without being tied down by preexisting regulations or second guessing in subsequent litigation. This is precisely the kind of governmental action that the discretionary function exception protects.

*Mich. Dep't of Nat. Res. v. United States*, No. 2:11-cv-303, 2012 WL 13028277 at *6 (W.D. Mich. May 29, 2012).

Moreover, this Circuit has recognized "the decision whether to warn of potential danger is a protected discretionary function." *Rosebush*, 119 F.3d at 443 (holding that discretionary

function exception covered Forest Service's decision to have open fire pits at campsite without providing warning of their danger); *see also Graves v. United States*, 872 F.2d 133, 137 (6th Cir. 1989) (failure to warn of danger on dam over which motorboat plunged was within discretionary function exception). Indeed, as the United States Court of Appeals for the Seventh Circuit has noted, the decision to warn is "replete with choices" and requires "ascertaining the need for a warning and its cost . . . determining the group to be alerted, as well as the content and procedure of such notice," and "balanc[ing] safety with economic concerns." *Maas v. United States*, 94 F.3d 291, 297 (7th Cir. 1996).

This Circuit also has recognized that an agency's allocation of personnel and resources is similarly shielded by the discretionary function exception. *See, e.g.*, *A.O. Smith Corp. v. United States*, 774 F.3d 359, 371 (6th Cir. 2014) (negligence claims regarding Army Corps' allocation of personnel was within discretionary function); *Sharp ex rel. Estate of Sharp v. United States*, 401 F.3d 440, 446-47 (6th Cir. 2005) (law enforcement staffing decisions are "of the kind that the discretionary function exception was designed to shield"); *Lockett v. United States*, 938 F.2d 630, 639 (6th Cir. 1991) (decision about "the allocation of limited agency resources, and determinations about priorities of serious threat to public health, are the very 'public policy' discretionary judgments Congress intended to shield from liability under section 2680(a)").

### 1. The First Prong of the *Gaubert* Test

The relevant inquiry for the first prong of the *Gaubert* test is whether a controlling statute, regulation, or established agency policy mandated that the Park Service fight the Chimney Tops 2 Fire in a specific manner. Remarkably, Plaintiffs admit that "*decisions to treat the fire as a prescribed burn and allow the fire to burn via an indirect-attack may have been a policy-based discretionary decision*." Compl. ¶ 71 (emphasis added).

17

Despite their astonishing admission that how to attack the fire was a "policy-based discretionary decision," Plaintiffs then allege, "Even if a fire manager's decision is a choice to be exercised within established objective safety standards, because Plaintiffs maintain the fire managers were negligent in their failure to follow such standards, the discretionary function exception does not apply." Compl. ¶ 73.

Plaintiffs improperly collapse the discretionary function inquiry into a question of whether the Park Service was negligent. "Negligence, however, is irrelevant to [the discretionary function exception] inquiry." *Rosebush*, 119 F.3d at 442. "If the presence of negligence were allowed to defeat the discretionary function exception, the exception would provide a meager shield indeed against tort liability." *Parsons*, 811 F. Supp. at 1416 (internal quotation omitted). Rather, the relevant inquiry is whether the government conduct at issue involves the permissible exercise of policy judgment, not whether the conduct was negligent. Moreover, this discretion is not curbed by the Park Service's alleged knowledge of the potential danger the fire posed. "It is the governing administrative policy, not the [Park Service's] knowledge of danger, that determines whether certain conduct is mandatory for purposes of the discretionary function exception." *Rosebush*, 119 F.3d at 442 (quoting *Autery v. United States*, 992 F.2d 1523, 1528 (11th Cir. 1993)).

The agency policies cited throughout and attached to Plaintiffs' Complaint establish that the Park Service's decisions when fighting wildfires require judgment and choice. For example, DO 18 provides, "The circumstances under which a fire occurs, and the likely consequences on firefighter and public safety and welfare, natural and cultural resources, and values to be protected, *dictate the appropriate response to the fire*." DO 18, ECF 2-1 at 5 (emphasis added). Further, the Fire Management Plan states:

When the objective is to put the fire out, *wildfire managers may apply different strategies and tactics as part of the fire response.* Aggressive suppression may be the preferred strategy for one portion of the perimeter, and on another portion of the perimeter point protection or monitoring may be the desired strategy. By taking into account the fire season, current and expected weather, current and anticipated fire behavior, fire managers can apply the best tactics to mitigate risks to the public and firefighters, meet protection priorities, while also meeting cultural/natural resource management objectives.

FMP, ECF 1-7 at 30 (emphasis added). And, according to the Redbook, "The principles of fire suppression action provide a framework for developing fire suppression strategy and for conducting fire suppression operations. Again, *these are not absolute or immutable rules*." The Redbook, Ex. 1 to MTD at 34 (emphasis added).

Nevertheless, Plaintiffs attempt to defeat the first prong of the discretionary function exception by citing scattershot provisions from various policies, alleging that they supply mandatory directives that curbed the Park Service's discretion while fighting the Chimney Tops 2 Fire. No provision cited by Plaintiffs, however, cabined the Park Service's discretion in any respect relevant to their claims. First, the policies on which Plaintiffs rely supply no mandatory directives because the Park Service did not intend them to be mandatory. But, even if this Court were to find that the policies cited by Plaintiffs are mandatory and binding upon the Park Service, the provisions cited do not defeat application of the exception because they are not sufficiently specific. Second, this Court should reject Plaintiffs' attempt to circumvent the discretionary function exception by drawing this Court's attention to alleged conduct that purportedly does not comply with a particular directive, and arguing that their claims are based upon that conduct instead of the true discretionary source of their injuries.

19

### a. The Policies Cited By Plaintiffs Do Not Constrain The Park Service's Discretion In Suppressing Wildfires

In an attempt to defeat the discretionary function exception, Plaintiffs cite provisions from five sources: (1) DO 18, (2) Reference Manual 18, (3) the Fire Management Plan, (4) the Fire Monitoring Handbook, and (5) the Redbook. Such documents, however, do not supply mandatory directives cabining the Park Service's discretion as to how to suppress a wildfire because the Park Service intended those policies only to provide guidance, not to be mandatory. *See Aragon v. United States*, 146 F.3d 819, 824 (10th Cir. 1998) (Air Force "did not intend the manual to be mandatory, but rather intended it as a guidance or advisory document."). Rather, each of these sources states that it is providing only guidance, leaving the specifics of fighting a given wildfire to the discretion of those involved.

DO 18 cannot be a source of any mandatory directive because the Park Service intended it to provide guidance, not to be a mandatory and specific policy. The first sentence of DO 18 provides, "[t]his Director's Order states the basic *principles* and strategic *guidelines* governing the management of wildland fire by the National Park Service (NPS)." DO 18, ECF 2-1 at 1. Principles and guidelines do not supply mandatory directives binding upon an agency. *Terbush v. United States*, 516 F.3d 1125, 1137 (9th Cir. 2008) (Park Service policy designated as Management Guidelines "explicitly states that it is a 'guideline,'" and thus was not a mandatory directive); *Riley v. United States*, 486 F.3d 1030, 1033 (8th Cir. 2007) (provisions of publication addressing engineering criteria were "guidelines and not mandatory" because the publication stated it was intended as "guidance" and a "reference manual"); *K.W. Thompson Tool Co. v. United States*, 836 F.2d 721, 729 (1st Cir. 1988) (agency manual stating that the "policies and procedures" set forth therein were intended as "guidance" and did not prescribe mandatory directives); *Valdez v. United States*, 56 F.3d 1177, 1179 (9th Cir. 1995) ("While the said policy

20

guidelines certainly outline general policy goals . . . the means by which NPS employees meet these goals necessarily involves an exercise of discretion. These guidelines can be considered mandatory only in the larger sense that they set forth broad policy goals attainable only by the exercise of discretionary decisions.").

DO 18 further provides that it:

> is intended to improve the internal management of the NPS and is not intended to, and does not create any right or benefit, substantive or procedural, enforceable by law, or equity, by a party against the United States, its departments, agencies, instrumentalities or entities, its officers or employees, or any other person.

DO 18, ECF 2-1 at 3. *See Dichter-Mad Family Partners, LLP v. United States*, No. 09-cv-9061, 2011 WL 538744 (C.D. Cal. Feb. 15, 2011), *aff'd,* 709 F.3d 749 (9th Cir. 2013) (stating that language in SEC Enforcement Manual suggested manual could not be source of mandatory directive).

Similarly, Reference Manual 18 is intended as a guidance document and does not prescribe mandatory directives. The first line of the manual provides, "Reference Manual 18: Wildland Fire Management, Chapters 1 through 21 represents the most detailed and comprehensive *guidance* on implementing Service-wide wildland fire management policy for the National Park Service." RM 18, ECF 5-1 at 11 (emphasis added). Additionally, according to RM 18's introduction, the manual:

> is intended to be read in its entirety. While certain chapters or sections provide important *guidance* by themselves, there is an interrelationship among the chapters that provides clarity and continuity for the management of wildland fire on lands administered by the National Park Service.

*Id*. at 5 (emphasis added). Further, "Reference Manual 18 provides NPS field employees legal references, operating policies, standards, procedures, general information, recommendations, and examples to assist them in carrying out Management Policies and Director's Orders." *Id*. Thus,

there can be no ambiguity that the plain language of RM 18 demonstrates that the Park Service intended the manual to provide guidance for wildfire suppression activities, not to be a binding source of mandatory directives.

The Redbook is intended to supplement Reference Manual 18. The Redbook, Ex. 1 to MTD at 6. The clear language of the Redbook rebuts the notion that it contains absolute rules or mandatory directives applicable to Park Service wildfire suppression efforts:

> The primary means by which we implement command decisions and maintain unity of action is through the use of common *principles* of suppression operations. These principles *guide* our fundamental fire suppression practices, behaviors, and customs, and are mutually understood at every level of command. . . . *They are not absolute rules. They require judgment in application.*
>
> The principles of fire suppression action provide a *framework* for developing fire suppression strategy and for conducting fire suppression operations. *Again, these are not absolute or immutable rules.*"

The Redbook, Ex. 1 to MTD at 34 (emphasis added).

Further, the Fire Management Plan cited by Plaintiffs cannot be a source of any mandatory directive because its introduction makes plain that it was intended to express goals and provide guidance for firefighting strategies and tactics, and not to prescribe mandatory directives. First, the sections in the Introduction regarding wildland fire management are phrased in terms of *goals* and *guidance*. *See, e.g.*, FMP, ECF 1-7 at 6 ("1.1 GRSM Wildland Fire Management *Goals*"); *id.* (emphasis added) ("1.2 Strategy to Achieve Wildland Fire Management *Goals*").[6] Moreover, Section 4 of the FMP, which governs wildland fire

---

[6] The Fire Management Plan's Introduction also provides, in pertinent part:

> This Fire Management Plan provides long-term direction for achieving park *goals* related to human safety and ecosystem management.
>
> This plan outlines those actions that will be taken by Great Smoky

22

suppression efforts, is titled, "4 Wildland Fire Operational *Guidance.*" *Id*. at 29 (emphasis

added). Moreover, regarding the Park Service's response to wildfires, the FMP unequivocally

expresses the agency's decision-making in terms of "goals" and "objectives":

> Beginning with the initial action to any wildfire, decisions will reflect the *goal* of using available firefighting resources to manage the fire in the safest, most effective, and most efficient means available while meeting identified fire management unit *goals* and *objectives.*

*Id*. at 30 (emphasis added). "'[O]bjectives' are precisely the type of directives that judgment and

choice are based on and are not sufficiently specific to satisfy the first prong." *Luther*, 2014 WL

1255292 at *4; *OSI, Inc. v. United States*, 285 F.3d 947, 952 (11th Cir. 2002) (finding that

objectives and principles do not create mandatory directives that overcome the discretionary

function exception).

Finally, the Fire Monitoring Handbook relied upon by Plaintiffs does not constrain the

Park Service's discretion in monitoring wildfires. The purpose of the handbook is to "ensure that

management *objectives* are being met" and "to provide *guidance* that can prevent fire

management problems from developing." FMH, ECF 2-3 at 3 (emphasis added). The FMH's

*Abstract* emphasizes the discretion afforded to parks to monitor wildfire: "Depending on a park's

management *objectives, a park may need a specific monitoring design beyond or instead of the

design covered in this handbook.*" *Id*. (emphasis added). Indeed, according to the FMH, "[a]

standardized system to cover the wide diversity of areas within the National Park Service will

need fine-tuning from park to park." *Id*. And, the FMH expressly recognizes that neither DO 18

---

> Mountain National Park in meeting the fire management *goals* for the park . . . .
>
> [T]his plan will help achieve resource management *objectives* . . . .

FMP, ECF 1-7 at 5 (emphasis added).

nor Reference Manual 18 specifies how monitoring is to be accomplished, and therefore the

FMH is intended to provide such *guidance*:

> *Neither DO-18 or RM-18 describes how monitoring is to be done.* This handbook
> provides that *guidance* by outlining standardized methods to be used throughout
> the National Park Service for documenting, monitoring, and managing both
> wildland and prescribed fires.

*Id*. at 13 (emphasis added).

None of the policies identified by Plaintiffs supplies mandatory directives binding upon

the Park Service as required to escape the discretionary function exception. Rather, the sources

cited by Plaintiffs set forth guidance, goals, or objectives that vest Park Service employees with

discretion in wildfire management. Accordingly, such policies fail to remove Plaintiffs' claims

from the scope of the discretionary function exception.

### b. The Policy Provisions Cited By Plaintiffs, Even If Mandatory, Are Not Sufficiently Specific To Defeat The Discretionary Function Exception

Even if this Court were to find that the policies cited by Plaintiffs are mandatory, the

provisions identified by Plaintiffs do not overcome the discretionary function exception because

they are not sufficiently specific. Rather, the policies merely set forth guidelines for assessing,

monitoring, and fighting forest fires. Other courts have routinely recognized that federal agency

policies on firefighting do not eliminate the exercise of discretion.

For example, the Ninth Circuit recognized in *Miller v. United States*, 163 F.3d 591 (9th

Cir. 1998), that while firefighting policies "outline certain requirements for fire suppression, they

do not eliminate discretion because *they do not tell firefighters how to fight the fire*." *Miller*, 163

F.3d at 595 (emphasis added). In that case, the plaintiffs sued the United States for damages

incurred when a forest fire spread from the Ochoco National Forest onto their private property.

The district court held that the discretionary function exception barred the plaintiffs' claims for

the Forest Service's alleged negligence in suppressing the fire, which reached the plaintiffs' property three days after being initially spotted. The Ninth Circuit affirmed the district court's decision, holding that the policies "did not tell the Forest Service to suppress the fire in a specific manner and within a specific period of time. *The existence of some mandatory language does not eliminate discretion when the broader goals sought to be achieved necessarily involve an element of discretion*." *Id.* (emphasis added).

Here, as in *Miller*, any mandatory language in the Park Service policies did not remove discretion regarding how to monitor and fight the Chimney Tops 2 Fire.

### i. Count One—Failure to Monitor

In Count One, Plaintiffs allege that policy directives mandated the Park Service conduct overnight monitoring, Compl. ¶¶ 300-303, but that no such monitoring occurred. *Id.* ¶ 305 ("no overnight monitoring of fire-activity or smoke-impacts of any kind was performed from the time the fire was discovered on Wednesday, November 23, 2016 through Monday morning, November 28, 2016."). Plaintiffs point to DO 18, RM 18, and the Fire Monitoring Handbook to support this alleged mandated overnight monitoring. *Id.* ¶ 301. Yet none of those sources provide mandatory and specific monitoring procedures.

Plaintiffs first point to DO 18, but that provision does not supply any directive that the Park Service monitor wildfires, either overnight or otherwise. Rather, DO 18 affords the Park Service discretion regarding how to manage wildland fires. *See* DO 18, ECF 2-1 at 3 ("All wildland fires will be effectively managed through application of the *appropriate strategic* and *tactical* management *options*.") (emphasis added). Plaintiffs next point to the following language in RM 18: "All wildland fire events must be monitored." Compl. ¶ 301 (quoting RM 18 at 8). Yet, nowhere in RM 18 is there a command for *overnight* monitoring. Although

monitoring of wildfires is generally called for by RM 18, the manual does not prescribe a specific course of action as to *when* or *how* such monitoring must be performed. Indeed, Plaintiffs acknowledge that "[n]either DO #18 nor Reference Manual 18 describes *how* such monitoring is to be done." Compl. ¶ 302 (emphasis added). Plaintiffs also then confess that "overnight monitoring may not be required for every wildfire." Compl. ¶ 308.

In an attempt to save Count One from the discretionary function exception, Plaintiffs point to language in the Fire Monitoring Handbook that directs Park Service employees to "monitor fire size, fuels, spread potential, weather, and smoke characteristics." Compl. ¶ 303. Yet, Plaintiffs concede that the FMH provides Park Service fire management officials "guidance" to be used for "monitoring and managing all wildland fires." Compl. ¶ 302. And Plaintiffs fail to note that the section immediately preceding the allegedly mandatory language cautions that such verbiage is intended as guidance: "*Recommended Standards* [regarding reconnaissance monitoring] are given here." FMH, 2-3 at 20 (emphasis added).

Even if this Court were to consider the FMH language cited by Plaintiffs to be mandatory, it is not sufficiently specific to defeat the discretionary function exception because it does not state *when* or *how* the Park Service is to perform such monitoring.[7] Plaintiffs then claim that the Park Service officials must "consider" the potential for a fire to leave a designated management zone. Compl. ¶ 304 (citing FMH at 10). The word "consider" does not supply a

---

[7] Plaintiffs also allege that the Park Service must "address" particular threats and constraints relative to the fire suppression effort. Compl. ¶ 303. The provision of the FMH they cite, however, actually states that the Park Service "note" such threats and constraints. This is a meaningless distinction, however, because the provision does not state with specificity the manner of how such threats and constraints are to be noted or dictate the action the Park Service must take in response to such threats and constraints.

compulsory edict that cabins the Park Service's discretion, and, even if it did, the FMH does not specifically prescribe *how* the Park Service is to contemplate the possibility of the fire spreading.

All of the provisions that Plaintiffs rely on leave the Park Service with discretion regarding how to monitor a forest fire. Accordingly, the discretionary function exception applies to Plaintiffs' failure to monitor overnight claim because Plaintiffs have not identified any mandatory and specific directive that constrained the Park Service's discretion regarding when and how to monitor the Chimney Tops 2 Fire.

> ### ii. Count Two—Failure to Comply with Command-Structure Requirements

Plaintiffs cite the Redbook and the Fire Management Plan for the proposition that mandatory directives required an Incident Commander and a Fire Duty Officer for the Chimney Tops 2 Fire suppression effort, and these documents prohibited a single person from holding both positions simultaneously. Compl. ¶¶ 315, 317, 319. According to Plaintiffs, FMO Salansky "wore too many hats" and his "invalid assumption of multiple command functions led directly to a lack of policy oversight, which, in turn, led to slipshod decisions throughout the fire concerning the Park's efforts to first contain and then suppress the fire and duty to notify and warn" of the fire's potential danger. *Id*. ¶ 325.

Assuming that the Redbook and the Fire Management Plan are mandatory and binding upon the Park Service (which they are not), Plaintiffs' allegations still cannot overcome the discretionary function exception because the Park Service did have an Incident Commander for the Chimney Tops 2 Fire, a point which Plaintiffs concede, and whether or when to have a Fire Duty Officer was a discretionary decision.

Plaintiffs admit that the Park Service had an Incident Commander ("IC") for the Chimney Tops 2 Fire—Salansky. *See Id*. ¶ 316 ("[A]fter [t]he Chimney Tops 2 Fire was discovered on

27

Wednesday, November 23, 2016, Salansky assumed the role of IC.").  Plaintiffs then allege that Duty Officer coverage was required for "periods of anticipated prolonged increased fire danger." *Id*. ¶ 317 (citing FMP at 40, Table 6).  The FMP provision upon which Plaintiffs rely for this allegation, however, does not set forth the precise manner in which a Fire Management Officer must assess whether a fire risk will be "prolonged" and is thus insufficiently specific to defeat the discretionary function exception.  Moreover, the express language of the FMP vests the Fire Management Officer with discretion in deciding whether to appoint a Fire Duty Officer:  "The Fire Management Officer is responsible for determining the need for and assignment of the Fire Duty Officer."  FMP, ECF 1-7 at 40, Table 6.  The FMP does not set forth a specific course of action that an FMO must follow in considering the need for a Fire Duty Officer.  Thus, even if such directive is mandatory, it does not provide a *modus operandi* that defeats the discretionary function exception.

Further, even if this Court finds that the policies cited by Plaintiffs imposed a mandatory and specific requirement that FMO Salansky assign a Fire Duty Officer for the Chimney Tops 2 Fire and also prohibited a single person from concurrently serving as the Incident Commander and Fire Duty Officer, the Park Service's violation of these directives is not the source of Plaintiffs' injuries.  Courts are not bound by a plaintiff's characterization as to what conduct his claim is based upon.  *Fisher Bros. Sales, Inc. v. United States*, 46 F.3d 279, 286 (3d Cir. 1995) (en banc) ("We know of no authority for the proposition that plaintiffs, by the manner in which they draft their complaints, may dictate that their claims are 'based upon' one government employee's actions and not another's."); *Gen. Dynamics Corp. v. United States*, 139 F.3d 1280, 1283 (9th Cir. 1998) ("Courts are not required to, and should not, simply look at the surface of a complaint for the purpose of ascertaining the true basis of an attack upon something the

28

government has done."); *id*. at 1285 (a plaintiff cannot circumvent the exception through "mislabeling and misdescription of the truly discretionary source of the injury."). Rather, a court must determine for itself what the plaintiff's claim truly is "based upon"—that is, the "injury-causing" conduct or decision. *Fisher Bros.*, 46 F.3d at 286-287.

For example, in *Fisher Bros.*, the U.S. Food and Drug Administration ("FDA") had received information from an anonymous caller that Chilean fruit had been injected with cyanide. *Fisher Bros.*, 46 F.3d at 282. An FDA laboratory conducted tests of a few grapes and concluded that they were tainted. The FDA Commissioner then exercised his discretion to deny entry of any Chilean fruit into the United States and to withdraw all such fruit already in domestic distribution channels. *Id*. at 283. The plaintiffs suffered significant losses. *Id*. Recognizing that they could not attack the Commissioner's discretionary decisions to ban and remove the fruit, the plaintiffs instead alleged that the laboratory's tests were not performed in compliance with the FDA's internal laboratory protocols, and thus constituted the breach of a mandatory directive. *Id*. at 285-86. The court rejected this characterization and held that plaintiffs may not draft their complaints so as to dictate that their claims are "based upon" one act rather than another. "The reality here is that the injuries of which the plaintiffs complain were caused by the Commissioner's decisions and, as a matter of law, their claims are therefore 'based upon' those decisions." *Id*. at 286. In other words, the plaintiffs did not suffer harm simply as a result of the laboratory's failure to follow mandatory procedures when testing the grapes. Rather, it was not until the Commissioner made the subsequent discretionary decision to ban the fruit could plaintiffs be said to have been harmed. Thus, the discretionary function exception applied, despite the preceding violations of mandatory agency directives.

29

The United States Court of Appeals for the Fifth Circuit's decision in *In re Katrina Canal Breaches Litig.*, 696 F.3d 436 (5th Cir. 2012), also is instructive. The plaintiffs there brought suit for Hurricane Katrina-related damages allegedly caused by the Army Corps of Engineers' negligence in designing and maintaining a navigation channel. Recognizing that decisions related to the design of such a project were shielded by the discretionary function exception, the plaintiffs tried to circumvent the discretionary function exception by alleging, among other things, that the Army Corps failed to comply with the requirements in the National Environmental Policy Act ("NEPA") that certain studies be conducted before making discretionary decisions relating to the design of the navigation channel. *Id.* at 449-451. The Fifth Circuit rejected this tactic, noting that it is "well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Id.* at 450 (citations and internal quotation marks omitted). While the failure to follow the NEPA procedures may have caused the agency to make decisions without having fully "inform[ed] their discretion," the agency "retain[ed] substantive decisionmaking power regardless" of what it may have learned during the NEPA process. *Id.* Although the failure to make such decisions without the benefit of having followed the NEPA procedures might constitute an abuse of discretion, that is "an abuse explicitly immunized by the" discretionary function exception. *Id.*

Here, Plaintiffs do not allege that FMO Salansky wearing too many hats *in and of itself* caused their injuries. Rather, Plaintiffs allege that FMO Salansky assumed too many roles during the Chimney Tops 2 Fire, and thus he had a "lack of policy oversight, which, in turn, led to slipshod decisions . . . concerning the Park's efforts to first contain and then to suppress the fire." Compl. ¶¶ 323, 325. Thus, the source of Plaintiffs' injuries – *i.e.*, the acts or omissions their claims are based upon – is the Park Service's allegedly negligent suppression of the

Chimney Tops 2 Fire. Plaintiffs acknowledge, though, that wildfire suppression decisions are discretionary. Compl. ¶ 71. And, it is widely recognized that "if a discretionary decision is made without following mandated procedures, it is an abuse of discretion and, as such, protected from judicial review . . . ." *Rosas v. Brock*, 826 F.2d 1004, 1010 (11th Cir. 1987). Stated another way, "making a discretionary decision without following mandated procedures should be characterized, for the purposes of the FTCA, as an abuse of discretion," which is expressly protected by section 2680(a). *Jayvee Brand, Inc. v. United States*, 721 F.2d 385, 390 (D.C. Cir. 1983); *see also Mahon v. United States*, 742 F.3d 11, 15-16 (1st Cir. 2014) (holding a failure to perform mandatory risk-management assessments of government property did not defeat exception, because agency had discretion regarding what, if any, measures to take had it performed such assessments and discovered dangerous conditions).

Therefore, even if agency policies forbade FMO Salansky from simultaneously fulfilling the Incident Commander and Fire Duty Officer roles, they do not defeat the discretionary function exception because they did not mandate that the Park Service suppress the Chimney Tops 2 Fire in a specific way and within a specified period of time.[8] "[T]he existence of some mandatory language does not eliminate discretion when the broader goals sought to be achieved necessarily involve an element of discretion." *Miller*, 163 F.3d at 595.

The rule from *Fisher Bros.*, *In re Katrina Canal Breaches Litig.*, and *Miller* is that plaintiffs may not avoid dismissal by looking behind discretionary, injury-causing decisions and argue instead that their claims are "based upon" separate, non-discretionary acts. That rule

---

[8] Further, although Plaintiffs attempt to portray Salansky as the sole NPS official making decisions during the Chimney Tops 2 Fire, Plaintiffs' Complaint includes numerous assertions to the contrary. *See, e.g.*, Compl. ¶¶ 131, 186, 203, 208 (citing actions also taken by Superintendent Cash, Deputy Superintendent Jordan, and Chief Ranger Kloster in managing the Chimney Tops 2 Fire suppression effort).

31

requires this Court to reject Plaintiffs' attempt to circumvent the discretionary function exception by focusing on the roles FMO Salansky assumed during the Chimney Tops 2 Fire, rather than the Park Service's ultimate, discretionary decision regarding how to suppress the blaze. Simply put, the discretionary function exception bars Plaintiffs' suit because it is, at bottom, "based upon" a policy-based, discretionary decision: how to fight a wildfire.

### iii. Count Three—Failure to Adhere to Mandatory Fire Management Policies and Requirements

In Count Three, Plaintiffs contend that the Park Service was negligent in myriad ways that failed "to adhere to mandatory fire management policies and requirements." Compl. ¶¶ 329-375. First, Plaintiffs allege that the Park Service was negligent by not completing a fire complexity analysis earlier in and more frequently during the Chimney Tops 2 Fire. *Id*. ¶¶ 332-336. According to Plaintiffs, "[a]s an incident escalates and de-escalates . . . a continuing reassessment of complexity *should* be completed to validate the current command-organization and identify the need for a different level of incident-management." *Id*. ¶ 333 (emphasis added). But Plaintiffs have failed to identify a mandatory directive which prescribes *when*, *how frequently*, or the *precise manner in which* a fire complexity analysis must be performed.[9]

Next, Plaintiffs allege that the Park Service "negligently implement[ed] a 410-acre containment box" and such decision violated DO 18's mandate that "protection of human life is the single, overriding suppression priority." Compl. ¶¶ 337-338. DO 18, Section 5.1F provides:

> The protection of human life is the single, overriding suppression priority. Setting priorities to protect human communities and community infrastructure, other property and improvements, and natural and cultural resources will be done based on human health and safety, the values to be protected, and the costs of protection.

---

[9] Plaintiffs also allege, "Significantly, at the Type 3 level, a complexity analysis *should* be performed daily." Compl. ¶ 335 (emphasis added). Yet Plaintiffs fail to identify a binding directive mandating that a complexity analysis be conducted daily at Type 3, let alone one that specifies the precise manner in which such analysis must be performed.

DO 18, ECF 2-1 at 5. Even if DO 18 is mandatory and binding upon the Park Service—which it is not—Section 5.1.F does not mandate a specific course of action for an employee to follow to achieve the objective of safeguarding human life.

Other courts have recognized that policy provisions focusing on the safety of humans do not remove discretion from the practice of fighting fires. For example, in *Luther v. United States*, No. 2:11-cv-268, 2014 WL 1255292 (D. Utah Mar. 26, 2014), the court rejected the plaintiffs' argument that the Forest Service violated a mandatory provision in failing to give priority to the safety of the public by, *inter alia*, not warning nearby residents of the impending danger of a fire. Forest Service Manual § 5130.3(2) provided: "Priority for Safety. In conducting wildland fire suppression, responsible officials shall give first priority to the safety of firefighters, other personnel, and the public." *Luther*, 2014 WL 1255292 at *5. The district court first determined that the Forest Service Manual provided "objectives and policies" for fighting forest fires and thus did not supply a mandatory and specific course of conduct for the Forest Service to follow. *Id.* Moreover, the court found that the plaintiffs emphasized only a portion of § 5130.3(2), failing to mention that the safety of firefighters and personnel (and thus not only that of the public) was a top priority. *Id.*

Here, DO 18 similarly does not prioritize the protection of the public above all else. Rather, DO 18, section 5.1.K., cited by Plaintiffs, provides that firefighter safety is also a consideration: "Fires will be suppressed at minimum cost, considering *firefighter and public safety*, benefits, and values to be protected, and be consistent with resource objectives." DO 18, ECF 2-1 at 6 (emphasis added). Further, section 5.1.K, like section 5.1.F, does not prescribe a specific course of action for prioritizing firefighter and public safety when suppressing a wildfire, and, as such, those decisions are grounded in judgment and choice.

Plaintiffs also allege in Count Three that the Park Service negligently: (1) failed to adopt contingency plans, Compl. ¶¶ 344-346; (2) disregarded fire-behavior modeling and weather forecast, *id*. ¶¶ 347-350; (3) failed to utilize available air operations, *id*. ¶¶ 351-353; and (4) failed to implement a universal communications system, *id*. ¶¶ 354-358.  But Plaintiffs have not identified any mandatory directives that cabined the Park Service's discretion in determining *whether, when, or how* to adopt contingency plans, use fire-behavior modeling and weather forecasts, employ aviation assets, or utilize certain communications capabilities.  Each of these allegations is fundamentally a challenge to the Park Service's allocation of personnel and resources to the Chimney Tops 2 Fire firefighting effort, and it is well-established that the discretionary function exception shields such decisions.  *A.O. Smith Corp.*, 774 F.3d at 371 ("We have held that decisions concerning 'the allocation of limited agency resources,' *Lockett v. United States*, 938 F.2d 630, 639 (6th Cir. 1991), 'time constraints and the availability of personnel with experience,' *Totten v. United States*, 806 F.2d 698, 701 (6th Cir. 1986), and decisions relating to the amount of personnel to assign to a particular task, *Sharp ex rel. Estate of Sharp v. United States*, 401 F.3d 440, 446 (6th Cir. 2005), all are policy considerations that trigger the discretionary function exception."); *see also Fang v. United States*, 140 F.3d 1238 (9th Cir. 1998) (decisions regarding equipment to be kept at various park stations and where to locate personnel with particular level of emergency medical training were susceptible to policy analysis); *Kiehn v. United States*, 984 F.2d 1100 (10th Cir. 1993) (level of staffing to devote to rescue operations protected by discretionary function exception); *Johnson v. United States*, 949 F.2d 332 (10th Cir. 1991) (discretionary function exception shielded decision concerning level of resources to allocate to rescue operations).

34

For example, in *Luther v. United States*, a lightning-caused fire started in the Dixie National Forest in July 2009. Because the fire initially was small and slow moving, the Forest Service decided to let it burn so as to benefit the ecology of the area rather than extinguish it. *Luther*, 2014 WL 1255292 at *1. The Forest Service monitored the fire for more than a month, as it grew to nearly 1,000 acres. In August 2009, however, the wind changed unexpectedly, blowing the fire down the mountain peaks toward the town of New Harmony, Utah. *Id.* Before the fire reached New Harmony, the Forest Service attempted to stop its progress and suppress the fire. Despite the Forest Service's efforts, the fire spread to the plaintiffs' property, destroying structures and vegetation. *Id.* The plaintiffs sued the United States under the FTCA for the Forest Service's alleged negligence in handling the fire. *Id.* at *2. The plaintiffs claimed, amongst other things, that the Forest Service failed to update computer models that predicted the fire's behavior and failed to assign proper personnel and resources to the fire. *Id.* at *5. The *Luther* court determined that the discretionary function exception barred the plaintiffs' claims because no directive cited by the plaintiffs prescribed a specific course of action for the Forest Service to follow in response to the fire. *Id.* at *4. Moreover, the court stated, "the assignment of resources, how to use those resources and when to utilize them are all classic elements of choice," *id.* at *5, and "decisions regarding the allocation of fire suppression resources are grounded in public policy," *id.* at *6.

Finally, Plaintiffs allege that the Park Service violated mandatory directives to utilize the Wildland Fire Decision Support System ("WFDSS") during the Chimney Tops 2 Fire. Compl. ¶ 366. The WFDSS is a "strategic fire management assessment and documentation process (program) used to determine the appropriate response to wildfires." FMP, ECF 1-7 at 65. According to the NPS Fire Review Team Report, WFDSS "is a web-based decision support

system that provides a single dynamic documentation system for use beginning at the time of the fire's discovery and concluding when the fire is declared out."  NPS Review Report, ECF 1-5 at 37.  The system "allows the agency administrator to: describe and analyze the fire situation, develop incident objectives and requirements, develop a course of action, evaluate relative risk, complete an organization assessment, document the rationale, and publish a Decision."  *Id.*

Plaintiffs allege that the Fire Management Plan directs fire managers to use the WFDSS on each wildland fire to document the decision-making process and outline the strategy and tactics employed.  Compl. ¶ 361.  Moreover, according to Plaintiffs, the Park's Fire Management Plan § 4.1.3 requires that once the Incident Commander determines the planned fire response strategy and tactics, such information must be relayed to the FMO or fire duty officer who will initiate the WFDSS documentation process and notify the Fire Management Committee.  *Id.* According to Plaintiffs, by Friday, November 27, when "it was evident that the objective (contain the fire within the 410-acre box) could not be met," *id.* ¶ 362, "the Park's FMP required Salansky and other fire managers to adopt the WFDSS to guide the ongoing effectiveness and reevaluation of suppression-strategies."  *Id.*  Plaintiffs acknowledge, however, that the "WFDSS was utilized to update acreage beginning on November 25 at 0758 hours through November 28 at 0550 hours."  *Id.* ¶ 365.

Although the Fire Management Plan states that WFDSS or its "equivalent" is to be used on each wildfire, the same paragraph of the FMP provides a qualification:  "The level of decision support documentation required will depend on the fire response level."  FMP, ECF 1-7 at 30. According to the FMP, use of WFDSS is called for during an "extended attack."  FMP § 4.1.3, ECF 1-7 at 47 ("Extended attack action requires a structured decision process (WFDSS) to guide

the ongoing effectiveness and re-evaluation of suppression strategies.").[10] Section 4.1.3 defines

an "extended attack" to be "when objectives have not been met in the case of initial fire

response, and/or where a fire managed for multiple objectives requires resources outside the

immediate pool of available to sustain long term management objectives." *Id.* Accordingly, the

language of § 4.1.3 unambiguously affords discretion to Park Service officials to determine

whether an "extended attack," and thus use of the WFDSS, is necessary based on their judgments

whether initial fire response objectives have been satisfied, and/or whether multiple objectives

demand additional resources to sustain long-term management goals. Indeed, even assuming

that WFDSS was required once the Park Service was in an "extended attack," "the decision

whether the antecedent condition exists"—*i.e.*, whether initial objectives have been satisfied or

multiple objectives demand additional resources—"afforded sufficient discretion to satisfy the

first prong of the *Gaubert* test." *A.O. Smith Corp.*, 774 F.3d at 365-66. Further, Plaintiffs do not

cite any directive specifically mandating *when* Park Service officials must transition to an

"extended attack" and accordingly utilize the WFDSS.

Moreover, Plaintiffs have not identified any directive that required the Park Service to

fight the Chimney Tops 2 Fire in a specific manner based on information generated by the

WFDSS. Fire Management Plan § 4.1.3 expressly states that the WFDSS is intended to "guide"

the fire suppression strategy; it does not mandate particular action. FMP, ECF 1-7 at 47. Put

---

[10] Plaintiffs also allege that RM 18 requires the Park Service to use WFDSS "to guide and document wildfire management decisions." Compl. ¶ 364 (citing RM 18 at 10). Even assuming RM 18 is mandatory and binding upon the Park Service (which it is not), the language cited is not sufficiently specific to defeat the discretionary function exception because it does not precisely prescribe how Park Service officials must use the WFDSS information during their decision-making. Further, although Plaintiffs allege that the Redbook mandated use of the WFDSS for all fires, *see* Compl. ¶ 365, the Redbook is a guidance document and not mandatory and binding upon the Park Service.

simply, even if at some point during the Chimney Tops 2 Fire Park Service officials exercised their discretion to shift to an "extended attack" and use of WFDSS was compulsory, Plaintiffs have not identified any directive mandating that Park Service employees use the WFDSS information in a specific manner to combat the wildfire.[11]

Regardless of the information the WFDSS may have generated, the Park Service retained policy-based discretion in deciding how to fight the Chimney Tops 2 Fire. While the failure to utilize the WFDSS during the Chimney Tops 2 Fire—as with the Army Corps' failure to follow mandated NEPA procedures in *In re Katrina Canal Breaches Litig.*, 696 F.3d at 449-50—may have caused the Park Service to make decisions without having fully "inform[ed] their discretion," the Park Service "retain[ed] substantive decisionmaking power regardless" of what it might have been learned from the WFDSS. Indeed, although the failure to make such decisions without the benefit of using WFDSS might have constituted an abuse of discretion, that is "an abuse explicitly immunized by the" discretionary function exception. *Id.*

### iv.    Count Four—Failure to Warn

In Count Four, Plaintiffs allege that the Park Service violated a mandatory directive in the Fire Management Plan that Park officials notify "Park neighbors, Park visitors and local residents . . . of all planned and unplanned fire management activities that have the potential to impact them." Compl. ¶ 378 (citing FMP § 3.3.2). Even assuming that the FMP is mandatory and binding upon the Park Service, FMP § 3.3.2 affords discretion to Park officials to determine *whether* and *when* fire management activities have the potential to affect those parties. FMP, ECF 1-7 at 28. Moreover, FMP § 3.3.2 is not sufficiently specific to defeat the discretionary

---

[11] Plaintiffs further allege that the FMP required periodic assessments. Compl. ¶ 363. But the FMP expressly states that use of the WFDSS, including periodic review, is "[a]s needed." FMP, ECF 1-7 at 48, Table 10, *Checklist of Wildfire Documentation*.

function exception because it fails to prescribe a course of action for *when* or *how* Park Service officials must notify neighbors, visitors, and local residents.

Plaintiffs next allege that Table 13 in FMP § 4.4.2 sets forth the actions Park Service officials must take to mitigate the risk of fire to the public. Compl. ¶ 379. According to Plaintiffs, Table 13, *Mitigations for Public Safety Issues*, requires that, with respect to Park neighbors, the Park Service must post "current fire information on websites as available" and "[i]nform park neighbors of wildland fires." *Id*. However, § 4.4 of the FMP, *Prevention, Mitigation, and Education*, in which Table 13 is included, refers to the Park's fire prevention program "objectives" and is thus not a mandatory directive. FMP, ECF 1-7 at 54. Even if the mitigation actions outlined in Table 13 were deemed mandatory, the measures are not sufficiently specific to defeat the discretionary function exception because they do not prescribe *when* or *how* the Park Service must notify Park neighbors of a wildfire. FMP, ECF 1-7 at 55. Moreover, the FMP states that the Park Service is to post current information on websites "as available," *id*., and does not specify the contents of the publications.

Consistent with its policy-based discretion regarding when and how to inform Park neighbors of its fire management activities, the Park Service issued a press release on November 23, 2016, describing the Chimney Tops 2 Fire and informing the public of trail closures. Compl. ¶ 383. Two days later, on November 25, 2016, the Park Service issued another press release describing the fire and informing the public of fire suppression efforts. *Id*. ¶ 384. On Monday, November 28, 2016, at approximately 10:00 a.m., another press release was issued:

> [It] describe[ed] how The Chimney Tops 2 Fire had grown to approximately 500 acres due to terrain, drought, and winds in excess of 20 mph. It also stated that "spot" fires around the Chimneys Picnic Area and Bullhead Ridge had been detected and suppression efforts were taking place at the picnic area. Additional trail and road closures were also identified. This release also stated that additional

fire-suppression resources were being ordered due to fire-size and predicted winds later in the day.

*Id.* ¶ 385. Moreover, between approximately 11:00 a.m. and 3:40 p.m. on November 28, 2016, "the Park issued two additional press releases and conducted a press conference at Park headquarters, providing various updates on fire-progressions, air quality advisories, and the areas affected by the fire." *Id.* ¶ 386. The 3:40 p.m. press release on Monday November 28, which was a "unified press release" by the City of Gatlinburg and the Park, stated that a "new spot fire posed a threat to the Mynatt Park neighborhood and that the [Gatlinburg Fire Department] was making preparations to protect Mynatt Park." *Id.* ¶ 387. The release "also advised that [Gatlinburg Police Department] officers were notifying residents to request voluntary evacuations." *Id.* It also "warned of more fire growth in the Park over the next eight hours with a potential for spot fires to form outside the fire area." *Id.* Shortly after the press briefing on November 28, "high-winds disrupted power in Gatlinburg and the surrounding area, preventing the dissemination of further published press releases." *Id.* ¶ 388.

Plaintiffs also allege in Count Four (and elsewhere in the Complaint), that the Park Service should have communicated earlier with Gatlinburg or other Sevier County officials. *See* Compl. ¶¶ 391, 392. Nonetheless, Plaintiffs have not identified any mandatory directive prescribing a particular course of action for Park Service employees to follow in communicating or coordinating with local or county officials regarding suppression of the Chimney Tops 2 Fire.

### 2. The Second Prong of the *Gaubert* Test

As to the second prong of the *Gaubert* analysis, "[w]hen established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324. "There is a *strong presumption* that

40

the second part of this *Gaubert* test is satisfied if a court concludes that the employee was exercising discretion." *A.O. Smith Corp.*, 774 F.3d at 365 (internal quotation omitted).

It is well-established that how to attack a fire is a policy-based judgment that "involve[s] a balancing of considerations, including cost, public safety, firefighter safety, and resource damage, and these considerations reflect the type of economic, social and political concerns that the discretionary function exception is designed to protect." *Backfire 2000*, 273 Fed. App'x. at 662 (internal quotation omitted); *Miller*, 163 F.3d at 596 ("While safety was one consideration, the decision regarding how to best approach the Bald Butte fire also required consideration of fire suppression costs, minimizing resource damage and environmental impacts, and protecting private property."); *Parsons*, 811 F. Supp. at 1420 ("In establishing priorities, assigning government personnel and equipment, and deciding what private resources, if any should be used, these employees were required to make social and economic policy decisions.") (quoting *Defrees v. United States*, 738 F. Supp. 380, 385 (D. Or. 1990)).

The Park Service's policies are replete with policy considerations that are implicated in wildfire suppression efforts, including firefighter and public safety, costs, environmental impacts, and availability of resources. *See, e.g.*, FMP, ECF 1-7 at 30 ("Strategies and tactics will consider firefighter and public health and safety, fire cause, current and predicted weather, current and potential fire behavior and fire effects, values to be protected from fire, management priorities, resource availability, cumulative effects of the fire, and cost effectiveness."); DO 18, ECF 2-1 at 6 ("Fires will be suppressed at minimum cost, considering firefighter and public safety, benefits, and values to be protected, and be consistent with resource objectives."); the Redbook, Ex. 1 to MTD at 27 ("The circumstances under which a fire occurs, the likely

41

consequences on firefighter and public safety and welfare, the natural and cultural resources, and the values to be protected dictate the appropriate response to fire.").

Confronting this body of case law and the clear-cut language of the policies upon which they rely, Plaintiffs acknowledge that "fire-management decisions . . . are *obviously grounded on considerations of public policy*." Compl. ¶ 70 (emphasis added). Nonetheless, in an attempt to save their claims from the discretionary function exception, Plaintiffs allege that FMO Salansky did not actually weigh policy considerations when deciding how to suppress the Chimney Tops 2 Fire. Compl. ¶ 73. The issue, however, is not whether a government employee *actually contemplated* various social, economic, or political considerations. "The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred . . . but on the nature of the actions taken and on whether they are *susceptible to* policy analysis." *Gaubert*, 499 U.S. at 325 (emphasis added). Moreover, the Sixth Circuit has pronounced, "[t]he requirement for a policy nexus is an objective, not a subjective one. The proper inquiry is whether the challenged actions are 'susceptible to policy analysis,' not whether they were the result of a policy analysis." *Rosebush*, 119 F.3d at 444 (quoting *Gaubert*, 499 U.S. at 325).

Plaintiffs also claim, "[w]hile the design of a course of governmental action is shielded by the discretionary function exception, the *implementation* and application of that course of action is not." Compl. ¶ 67. However, this argument has been recognized as nothing more than a perpetuation of the distinction between high-level policy decisions and operational activities that *Gaubert* expressly repudiated. In *Gaubert*, the Supreme Court stated, "Discretionary conduct is not confined to the policy or planning level" and the dichotomy between discretionary functions and operational activities is "nonexistent." *Gaubert*, 449 U.S. at 325-26. Moreover, the Sixth Circuit has held that "[t]he discretionary-function exception protects both high-level

policymakers and the employees who *implement* broader governmental objectives." *Kohl v. United States*, 699 F.3d 935, 944 (6th Cir. 2012) (emphasis added).

Similarly, in *Cope v. Scott*, 45 F.3d 445 (D.C. Cir. 1995), the D.C. Circuit rejected plaintiff's argument that the "'implementation' or 'execution' of policy decisions . . . is never protected under the exception." *Id.* at 449. The court characterized this argument as "merely an effort to establish yet another in a long series of 'analytical frameworks' that the Supreme Court has rejected as an inappropriate means of addressing the discretionary function exemption." *Id.* (citations omitted). The *Cope* court elaborated:

> The mechanistic application of these frameworks encourages courts to avoid the proper analysis: Whether the nature of the decision involved the exercise of policy judgment. *Gaubert* cautioned against this sort of shortcut when it rejected a lower court decision that relied upon a distinction between exempt 'planning' decisions and non-exempt 'operational' decisions.

*Id.* (citations omitted). "Recognizing that the focus is on the nature of the decision, not on the semantic pigeonhole into which the action can be put," *id.* at 450, the court declined to hold that decisions made while "implement[ing]" a previous policy decision fell outside of the discretionary function exception. *Id.* at 449.

Plaintiffs also argue that the discretionary function exception does not shield the Park Service's decisions because "the on-the-ground decisions made by fire-managers are akin to matters of scientific and professional judgment, not decisions involving 'social, economic, and political policy.'" Compl. ¶ 70. This argument too has been expressly repudiated by the Supreme Court and the Sixth Circuit, which have held that the exercise of "technical skills and business expertise" do not remove decisions from the discretionary function exception. *Gaubert*, 499 U.S. at 331 (rejecting argument that "the challenged actions [regarding supervision of a savings and loan institution] fall outside the discretionary function exception because they

43

involved the mere application of technical skills and business expertise"); *Kohl*, 699 F.3d at 944-945 (holding that, under *Gaubert*, operator error in working a winch was within the discretionary-function exception even though it "involved the mere application of technical skills and business expertise.").

In a last ditch effort to save their claims, Plaintiffs assert that there is "no evidence" that the Park Service's alleged failure to notify city officials or private citizens of the danger posed by the Chimney Tops 2 Fire was susceptible to policy analysis. Compl. ¶ 399. Yet, the Sixth Circuit has held that "even if there is *no* evidence that policy concerns were the basis of a challenged decision, the discretionary function exception applies if the decision is susceptible to policy analysis." *Rosebush*, 119 F.3d at 444 (emphasis in original); *see also Myslakowski v. United States*, 806 F.2d 94, 97 (6th Cir. 1986) ("The critical error in the trial court's analysis is in its conclusion that because the evidence does not show that the departmental policymakers evaluated the pros and cons of requiring that a warning be given" that the discretionary function exception did not apply.).

It is widely-recognized that decisions regarding how, when, or even whether, to warn of dangerous conditions on federal land implicate several policy considerations, such as public safety, cost and resource allocation, and the risk of the public over-reacting. *See e.g.*, *Rosebush*, 119 F.3d at 443 (decision relating to warning of potential danger shielded by discretionary function exception); *Lockett v. United States*, 938 F.2d at 639 (decision by EPA not to warn residents of PCB contamination protected by discretionary function exception)*; Loughlin v. United States*, 393 F.3d 155, 164 (D.C. Cir. 2004) (requiring an agency to warn potentially affected persons about public health hazards "would insert the courts into prioritization and resource allocation decisions that implicate serious political, social, and economic

44

considerations."). Thus, Plaintiffs' failure to notify claims are subject to the discretionary function exception.

<u>**CONCLUSION**</u>

The essence of Plaintiffs' Complaint is that the Park Service should have done a better job in suppressing the Chimney Tops 2 Fire. The issue, however, is not whether Park Service officials made the best choices, but whether they were constrained by mandates that were so specific that there was no room for judgment or choice. Making decisions in fighting a wildfire require the weighing of costs, benefits, and alternatives. Plaintiffs' claims merely allege negligence—*i.e.*, an abuse of the policy-based discretion in deciding how to combat a wildfire. It is clear that the policies cited by Plaintiffs were not intended to bind the Park Service, but only to provide guidance for wildfire suppression activities. Even if the Court were to find the policies cited by Plaintiffs to be mandatory, the cited provisions lack the requisite specificity to defeat the discretionary function exception. Further, there is a lack of any meaningful connection between the allegedly mandatory directives cited by Plaintiffs and the true discretionary source of their harms. Thus, the existence of myriad acts of discretion performed within the policy-laden regime of wildfire suppression compels the conclusion that the discretionary function exception bars Plaintiffs' lawsuit.

Dated: October 10, 2018                    Respectfully submitted,

                                            JOSEPH H. HUNT
                                            Assistant Attorney General

                                            THOMAS G. WARD
                                            Deputy Assistant Attorney General

                                            MATTHEW J. GLOVER
                                            Counsel to the Assistant Attorney General

                                            JAMES G. TOUHEY, JR.

45

Director, Torts Branch

RUPERT MITSCH
Assistant Director, Torts Branch

*/s/ Debra R. Coletti*
DEBRA R. COLETTI, DC Bar. No. 502140
THEODORE W. ATKINSON
ELLIOTT M. DAVIS
MARTIN F. ST. AUBIN
Trial Attorneys, Torts Branch
United States Department of Justice
Benjamin Franklin Station, P.O. Box 888
Washington, D.C. 20044
Telephone: (202) 616-4296
Email: debra.coletti@usdoj.gov

Attorneys for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2018, I electronically filed the foregoing with the Clerk of Court via the Court's Electronic Filing System, which will provide electronic notification to all Filing Users.  Any parties who are not Filing Users will be served with a paper copy of the foregoing by first-class mail, postage pre-paid.


*/s/ Debra R. Coletti*
DEBRA R. COLETTI