| | |
|---|---|
| MICHAEL B. REED, et. al.,<br>    Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>    Defendant. | Case No. 3:18-cv-201-JRG-CRW<br>Hons. Greer / Wyrick |
| BRITTANY N. HYRE ANCULLE, et. al.,<br>    Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>    Defendant. | Case No. 3:18-cv-308-JRG-CRW<br>Hons. Greer / Wyrick |
| BRITTANY ADKINS, et. al.,<br>    Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>    Defendant. | Case No. 3:18-cv-310-JRG-CRW<br>Hons. Greer / Wyrick |
| JAMES CARL VANCE, et. al.,<br>    Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>    Defendant. | Case No. 3:19-cv-283-JRG-CRW<br>Hons. Greer / Wyrick |
| JACKIE SUE BARNES, et. al.,<br>    Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>    Defendant. | Case No. 3:19-cv-296-JRG-CRW<br>Hons. Greer / Wyrick |

**RESPONSE IN OPPOSITION TO RENEWED MOTION TO DISMISS**

Plaintiffs, by the undersigned counsel, respond to the Renewed Motion to Dismiss filed by the United States of America (the "Government") [Doc. 49].[1]

## INTRODUCTION

The Government's Renewed Motion to Dismiss is nothing more than a motion for reconsideration. Judge Phillips has already decided that the discretionary function exception does not apply to Plaintiffs' failure-to-warn claim. There has been no change in the law or the facts since that decision. The only thing that has changed is the presiding Judge. The Government makes no attempt to demonstrate the existence of clear error or manifest injustice in Judge Phillips's ruling. It does not even provide the legal standard for reconsideration. Instead, the Government simply rehashes the unsuccessful arguments from its previous Motion, apparently under the theory of "New Judge, New Rules."

After recycling its old arguments, the Government attempts to distinguish its new Motion from its old one, claiming that it now brings a factual rather than a facial challenge. The facts now introduced were available to the Government before and should have been raised earlier. Even more importantly, many of these new facts come in the form of self-serving Declarations from Government employees. Making a ruling based on this one-sided evidence, and before meaningful discovery has begun, would be inappropriate.

Moreover, even these new facts cannot supplant the inescapable conclusion that the Government let the Chimney Tops 2 fire burn for five days without warning Park neighbors. The November 23 and November 25 press releases were not warnings, and there was no communication of any kind given to Park neighbors or local residents from Saturday, November

---

[1] Though the arguments herein apply to all captioned cases, [*see* Renewed MTD at 2 n.1], all record citations refer to the docket in *Reed v. United States*, Civ. No. 3:18-cv-201.

26, until Monday, November 28 , at 11:20 AM [Doc. No. 49-3 at 14]. The November 28 press release issued at 11:20 AM read, in relevant part:

> The fire currently poses *no immediate threat to structures at LeConte Lodge or any areas outside of park boundaries including Gatlinburg, Pittman Center, or Cosby facilities*.

[Compl. ¶ 386, Doc. 1 (emphasis added)]. Only hours later, Gatlinburg was engulfed by fire spread from the Great Smoky Mountains National Park ("Park"), causing the loss of fourteen lives and costing more than $1 billion in property damage. The Government's Motion should be denied.

## **FILED PLEADINGS BEFORE JUDGE PHILLIPS'S RULING**

Plaintiffs filed a 148-page Complaint with three factually-related documents attached to the Complaint [Doc. 1]. These three exhibits were:

1. National Park Service U.S Department of the Interior "Chimney Tops 2 Fire Review: *Individual Fire Review Report*" [Doc. 1-5];[2]
2. Sevier County and City of Gatlinburg, Tennessee, "After Action Review of the November 28, 2016, Firestorm" [Doc. 1-6]; and
3. Great Smoky Mountains National Park "Fire Management Plan" [Compl. at 444–529].

On October 10, 2018, the Government filed its original Motion to Dismiss in *Reed* entitled, "Defendant United States of America's Motion to Dismiss for Lack of Subject Matter Jurisdiction" [1st MTD, Doc. 23]. In its original Motion, the United States argued that the Federal Tort Claims Act's ("FTCA") discretionary function exception barred Plaintiffs' lawsuits. Attached to the Government's Motion as Exhibit 3 was a 462-page document entitled, "Interagency Standards for Fire and Fire Aviation Operations," dated "2016", produced and

---

[2] "A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c); *see also Eiswert v. United States*, 322 F.Supp.3d 864 (holding that consideration of extrinsic materials turns a facial challenge into a factual challenge).

utilized by the United States Department of the Interior and the United States Department of Agriculture, also referred to as the "Redbook."

## STATEMENT OF FACTS

A more fulsome recitation of the facts of this case is provided in Plaintiffs' Opposition to the Government's first Motion [Doc. 29 at 7–15] and in the Complaint [Doc. 1], which Plaintiffs incorporate herein.

The Great Smoky Mountains National Park Fire Management Plan contains the National Park Service's policies for responding to a fire. [Doc. 1-7]. The Plan states, "Park neighbors, Park visitors and local residents will be notified of all planned and unplanned fire management activities that have the potential to impact them." [*Id.* § 3.3.2(C) at p. 28]. It also requires a number of actions to "protect values at risk and to ensure the safety of park staff and visitors as well as the neighboring public." [*Id.* § 4.4.2(F) at p. 55]. Those requirements include among others, "Post current fire information on websites as available," and, "Inform park neighbors of wildland fires." [*Id.*]

On Wednesday, November 23, 2016, the Park discovered a small, smoldering vegetation fire less than one acre in size. [Compl. ¶¶ 95, 99]. The Park closed the trail to the public. [*Id.* ¶ 99]. A press release was issued announcing closure of trails in the area. [*Id.* ¶ 383]. The Press Release did not warn Park neighbors, local residents, or visitors that the fire might leave the Park. [*Id.* ¶ 382].

Thursday, November 24, was Thanksgiving Day, a federal holiday. The Park determined the fire had not grown much from the previous night. [*Id.* ¶ 128]. The Park decided to let the fire burn and contain it using natural and human-made boundaries. [*Id.* ¶¶ 129–30]. No press release or warning was issued on that date.

On Friday, November 25, the fire had grown to approximately two acres in size. [*Id.* ¶ 135]. The Park devised a strategy of containing the fire to a 410-acre "containment box." [*Id.* ¶ 137]. That day the Park issued a second press release stating, falsely, that "fire suppression crews were establishing containment lines." [*Id.* ¶ 384]. Like the November 23 press release, this press release failed to warn of danger to people in surrounding areas. [*Id.* ¶ 382].

On Saturday, November 26, the fire had grown to six to eight acres in size. [*Id.* ¶ 149]. Before dawn a Park employee conducted computer-model forecasts, after which he "expected any fires that were out there to spread, and to spread quickly." [*Id.* ¶ 146]. At 3:21 AM, the Fire Weather Planning Forecast issued a high-wind forecast, predicting strong winds by Monday. [*Id.* ¶¶ 146, 149]. That afternoon, an additional weather forecast predicted strong winds blowing towards Gatlinburg. [Doc. 1-5 at 61]. The Defendant called for air support on Saturday, November 26. [Answer ¶ 24, Doc. 52; *Anculle* Answer, Doc. 45 in 18-cv-308, ¶ 88]. No air support arrived until Sunday, November 27. [Compl. ¶ 157]. That night, three weather stations recorded extremely low relative humidity, indicating that the fire would actively burn. [*Id.* ¶ 158]. The Park made no effort to contact Sevier County, Gatlinburg, or Pigeon Forge officials or the public. [*Id.* ¶¶ 153, 160]. No press release was issued at all on this date. [*Id.* ¶ 385].

By the morning of Sunday, November 27, the fire had grown to 20–25 acres.[ *Id.* ¶ 163]. By the end of the day it would grow to 35–40 acres. [*Id.* ¶ 174]. A weather forecast predicted strong winds growing stronger throughout the day, and another warned of "critically dry conditions," high winds, and "enhanced fire danger." [*Id.* ¶¶ 161, 163]. Air support had been called and arrived on Sunday but failed to extinguish the fire. [*Id.* ¶ 157]. Once again, no press release was issued. [*Id.* ¶ 385]. Park neighbors (including the Gatlinburg Fire Department), local residents, and visitors still had not been notified of the potential for imminent danger. [*Id.* ¶ 165].

Windy and unmonitored overnight, the fire broke outside of the containment box, growing to 250–500 acres in size and starting spot fires as far as a mile away. [*Id.* ¶¶ 183, 185–86, 192]. That morning, Monday, November 28, the Gatlinburg Fire Department Chief initiated contact with the Park's fire management officer, Greg Salansky. [*Id.* ¶¶ 193]. At 10:58 AM, when Salansky returned the Chief's call almost two hours later, that call was the first communication between Park staff and any Gatlinburg official. [*Id.* ¶ 194]. Salansky told the Chief that the Fire Department "would be alerted if needed." [*Id.* ¶ 194]. He refused help from the Fire Department, saying, "it's under control." [*Id.* ¶ 194].

By noon Monday, the fire had grown to 500 acres. [*Id.* ¶ 202]. Fire was spotted at the Twin Creeks Science and Education Center, meaning it had spread three miles in 4.5 hours. [*Id.* ¶ 202]. Fire had also moved to the Twin Creeks Picnic Pavilion only 1.5 miles from Gatlinburg. [*Id.* ¶ 201]. Park officials met with officials from the City of Gatlinburg, the Gatlinburg Fire Department, and the Gatlinburg Police Department. [*Id.* ¶ 203]. At 12:30, various local officials were briefed at Mynatt Park, where Salansky recommended voluntary evacuations of the Mynatt Park area. [*Id.* ¶¶ 212, 213]. At 1:00 PM, Sevier County, Gatlinburg, and Pigeon Forge officials were advised that the fire was out of control and was likely to spread, and recommended evacuation [*id.* ¶ 208].

Despite increasingly troubling signs of the fire's spread, the Government failed to warn Park neighbors, local residents, and visitors for much of the day on Monday. At approximately 10:00 AM the Park issued a press release describing the fire and suppression efforts but saying nothing about the imminent danger to surrounding areas. [*Id.* ¶ 385]. At 11:20 AM that day, the Park issued an Advisory stating in part, "The fire currently *poses no immediate threat to . . . any areas outside of park boundaries including Gatlinburg*, Pittman Center or Cosby." [*Id.* ¶ 386

(emphasis added)].

By 2:00 PM the fire was estimated to be moving as fast as half a mile per hour. [*Id.* ¶ 218]. By 3:00 PM the fire had ignited approximately 2,000 acres. [*Id.* ¶ 220]. Finally, at around 3:40 PM, the City of Gatlinburg and the Park issued a press release stating that a spot fire threatened the Mynatt Park neighborhood of Gatlinburg and that Gatlinburg Police were requesting voluntary evacuations. [*Id.* ¶ 387].[3] By 5:00 PM the fire had ignited 4,000 acres. [*Id.* ¶ 225]. At 5:45 PM came the first report of fire in Gatlinburg—only two hours after the press release belatedly acknowledging danger to Park neighbors. [*Id.* ¶¶ 225, 229]. The Chimney Tops 2 Fire resulted in three deaths within Gatlinburg and eleven deaths in the Chalet Village North community. [*Id.* ¶ 268]. About 2,500 structures were damaged or destroyed. [*Id.*].

## PROCEDURAL HISTORY

Plaintiffs are suing the Government for negligently failing to provide the warnings required by the Fire Management Plan. On October 10, 2018, the Government moved to dismiss Plaintiffs' cases for lack of subject matter jurisdiction. [Doc. 23]. The Government argued that, though the United States has partially waived its sovereign immunity under the Federal Tort Claims Act ("FTCA"), all actions alleged in this case fall under the FTCA's "discretionary function" exception, 29 U.S.C. § 2680(a), meaning that sovereign immunity applies. [1st MTD]. After receiving briefing, the Court held a motion hearing on July 22, 2019. [*See* Doc. 40]. At that hearing, Plaintiffs conceded that while the Complaint alleges many violations, they now stand on their failure-to-warn claim. [Op. at 4–6, Doc. 35]. On December 9, 2019, the Court denied the Motion to Dismiss, explaining in a 20-page opinion that the Fire Management Plan contained "mandatory directives," placing the Government's actions outside the scope of discretionary

---
[3] This press release appears to be the same as the "E-Blast" described by Dana Soehn. [2d MTD at 13–14, Doc. 49-3 ¶ 13].

functions shielded by the FTCA. [*See generally id.*]. The Court applied the same analysis to two associated cases on December 20, 2019. [2d MTD at 3 n.2, Doc. 49].

On January 6, 2020, this case was reassigned from Judge Thomas W. Phillips to Judge J. Ronnie Greer. [Doc. 47]. Unhappy with the ruling of Judge Phillips, the Government seized upon the change of Judge by filing a renewed motion to dismiss, despite there being no intervening docket activity (save for a notice of appearance by counsel). [Doc. 49]. Once again, the Government argues that the discretionary function exception should apply to Plaintiffs' failure-to-warn claims. [*Id.*]. The Government claims, however, that while its first Motion raised a facial challenge, the present Motion raises a factual challenge. [*Id.* at 1]. No substantive discovery has been conducted on the facts of this case.

## STANDARD OF REVIEW

"Motions to reconsider are used sparingly and in rare circumstances." *Grogg v. Clark*, 2016 WL 1394534, at *1 (E.D. Tenn. Apr. 7, 2016) (Greer, J.). The Court's authority to reconsider interlocutory orders stems from both common law and Federal Rule of Civil Procedure 54(b). *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004). Reconsideration may be granted if there is "(1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Howe v. City of Akron*, 801 F.3d 718, 741 (6th Cir. 2015) (quoting *Entm't Prods., Inc. v. Shelby Cnty.*, 721 F.3d 729, 742 (6th Cir. 2013)). Reconsideration is not appropriate on a motion that "fail[s] to cite to or include . . . any intervening change in the law, newly discovered evidence, or injustice caused by clear error" and that "merely restyle[s] or rehash[es] the initial issues." *Grogg*, 2016 WL 1394534, at *1 (internal citation omitted).

**DISCUSSION**

I. **Judge Phillips's Order Denying the Government's Motion to Dismiss was Correct, and Certainly Not "Clear Error"**

The FTCA provides that waiver of sovereign immunity does not apply to "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The Supreme Court has established a two-part test for courts to apply when deciding whether the discretionary function exception applies to the actions of a governmental entity. *See United States v. Gaubert*, 499 U.S. 315, 322-23 (1991); *Rosebush v. United States*, 119 F.3d 438, 441 (6th Cir. 1997); *Mays v. TVA*, 699 F. Supp. 2d 991, 1003-04 (E.D. Tenn. 2010). "The first part of the test requires a determination of whether the challenged act or omission violated a mandatory regulation or policy that allowed no judgment or choice." *Rosebush*, 119 F.3d 438, 441 (citing *Gaubert*, 499 U.S. at 322-23). If the challenged conduct involved an element of judgment, the second part of the test looks to see "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Mays*, 699 F. Supp. 2d at 1010 (citing *Gaubert*, 499 U.S. at 322-23). The discretionary function exception applies only if both parts of the test are satisfied.

In his December 2019 opinion, Judge Phillips examined two provisions of the Fire Management Plan: Section 3.3.2.(C), which states that, "Park neighbors, Park visitors and local residents *will* be notified of all planned and unplanned fire management activities that have the potential to impact them;" and Section 4.4.2(F) and accompanying Table 13, which name "mitigation actions *required* to protect values at risk and to ensure the safety of park staff and visitors as well as the neighboring public," including, "Post current fire information on websites as available," and "Inform park neighbors of wildland fires." [Op. at 15–17 (emphasis added by

9

J. Phillips)]. Comparing these provisions with those found in precedential cases, the Court concluded that these provisions contain "mandatory directives," and for that reason there was no discretionary function as required in step one. [*Id.* at 17–20]. In short, the Court examined this question, discussed the relevant provisions of the Fire Management Plan and the relevant precedents, and correctly concluded that the discretionary function exception does not apply.

The Government seeks reconsideration but does nothing more that "restyle or rehash the initial issues." *Grogg*, 2016 WL 1394534, at *1 (internal citation omitted). Ironically, even as the Government warned about "revisit[ing] judgment calls by federal agencies" [1st MTD at 2], it now asks to revisit the judgment call of the Court.

First, the Government argues that "[b]oth sections afford the NPS discretion to determine whether, when, how, and to whom it informs about fires or fire management activities, and judgment as to the contents of that information." [2d MTD at 6]. The Government previously made the same argument [1st MTD at 38 (Fire Management Plan "§ 3.3.2 affords discretion to Park officials to determine *whether* and *when* fire management activities have the potential to affect those parties" (emphasis in original))], and it is just as wrong now as it was then. Judge Phillips ruled that "the actions listed in Table 13 are specific as to when and how warnings should occur." [Op. at 18]. His conclusion is supported, on somewhat different grounds, by the reasoning of the Sixth Circuit in *A.O. Smith Corp. v. U.S.*, 774 F.3d 359, 367 (6th Cir. 2014) (citations omitted):

> The district court concluded that even if the Corps was required to preserve Old Hickory's surcharge storage, the Corps "is not directed specifically *how* and *when* to perform the various tasks." Although we affirm the district court's dismissal of this claim, we do not adopt this reasoning. Corps protocols may fail to specify *how* and *when* they are to be implemented, but the protocols may nonetheless be nondiscretionary as to *whether* they are to be implemented.

Second, the Government argues, "if a policy involves an 'if/then' logical structure,

requiring an employee to exercise discretion to satisfy a predicate condition before any mandatory action, the policy necessarily involves an element of judgment or choice." [2d MTD at 6 (citing *Myers v. United States*, 17 F.3d 890, 895–96 (6th Cir. 1994); *Jude v. Comm'r of Soc. Sec.*, 908 F.3d 152, 160–61 (6th Cir. 2018))]. But the Court previously addressed this issue at length and found that the primary case now cited by the Government is distinguishable:

> In *Myers*, the regulation at issue stated, *inter alia*, "if, during mandatory quarterly inspections, a safety violation is discovered, then inspectors must issue a citation and, if the violation poses an 'imminent danger,' a withdrawal order[.]" The Court concluded that the "if/then" logical structure of the duties contained in the regulation presents the official with a choice as to whether the condition precedent exists, which was sufficient to satisfy the first prong of *Gaubert*. However, unlike the language in *Myers*, neither the language in § 3.3.2 nor Table 13 contains the "if/then" language. Section 3.3.2 specifically states that Park neighbors will be notified of all planned and unplanned fire management activities that have the potential to impact them. This section specifies who is to be notified (Park neighbors), and what activities they are to be notified of (planned and unplanned fire management activities that may affect them). Moreover, none of the activities listed in Table 13 relating to warning park neighbors (i.e., posting current fire information on websites, informing Park neighbors of wildland fires, and using information officers and/or park public affairs to disseminate information) are phrased in an "if/then" manner. Rather, the [Fire Management Plan] states that these activities are *required*. Further, the actions listed in Table 13 are specific as to when and how warnings should occur, namely, Park neighbors should be informed in the event of a wildland fire, using various means, including the internet and information officers.

[Op. at 17–18 (citations omitted)].

In response, the Government argues that the provisions of the Fire Management Plan actually contain a number of hidden "if/then" structures: Park officials cannot notify "Park neighbors, Park visitors and local residents . . . of all planned and unplanned fire management activities that have the potential to impact them" without "determining who the relevant 'Park neighbors, Park visitors and local residents' are," or defining "fire management activity" or "potential to impact;" nor can they "[p]ost current fire information on websites as available" without determining the meaning of "as available." [2d MTD at 6–8]. The Court should not

11
Case 3:18-cv-00201-JRG-CRW   Document 61   Filed 03/26/20   Page 11 of 19   PageID #: 3352

follow the Government down this semiotic rabbit hole. All words are somewhat vague, with "a core of settled meaning . . . as well [as] a penumbra of debatable cases in which words are neither obviously applicable nor obviously ruled out." *See* H. L. A. Hart, *Positivism and the Separation of Law and Morals*, 71 Harv. L. Rev. 593, 607 (1958). But it does not follow that all directives containing words are matters of inescapable discretion. Were that the case, "the discretionary function exception to the Tort Claims Act could potentially swallow the entire Act." *Cf. Rosebush*, 119 F.3d at 445. And even if the Government is right that, for example, discretion is needed to define "Park neighbors, Park visitors and local residents," it has not explained how that discretion is "grounded in social, economic, and political policy." *Gaubert*, 499 U.S. at 323.[4]

> Judge Phillips stated in the Court's ruling:
>
> Under the first prong of the *Gaubert* test, the relevant inquiry is whether the controlling statutes, regulations, and administrative policies mandate that the governmental entity conduct a certain activity in a *specific* manner. *Rosebush*, 119 F.3d at 442. In such an event, "the employee has no rightful option but to adhere to the directive." *Bultema v. United States*, 359 F.3d at 379, 384 (6th Cir. 2004) (quoting *Berkovitz*, 486 U.S. at 536).

In short, Judge Phillips's original decision was correct. The Government has failed to demonstrate that it was erroneous, let alone clearly erroneous.

## II. The Court Should Not Consider Any Newly-Presented Facts

The Government also tries to present its Motion as more than one for reconsideration because, "This motion to dismiss is a factual challenge to Plaintiffs' complaints, while the United States' original motion to dismiss was a facial challenge." [2nd MTD at 1]. First, it is improper to use a motion for reconsideration to add "evidence in support of new legal arguments that

---

[4] The Government devotes one footnote of its brief to the second step of the *Gaubert* analysis. [2d MTD at 8 n.3]. Plaintiffs previously briefed that issue at length, [Doc. 29 at 34–38, 45–47; *see also* Doc. 40], and incorporate their arguments in opposition to the Government's present Motion.

12
Case 3:18-cv-00201-JRG-CRW   Document 61   Filed 03/26/20   Page 12 of 19   PageID #: 3353

should have been raised earlier." *CGH Transport, Inc. v. Quebecor World, Inc.*, 261 F. App'x 817, 824 (6th Cir. 2008) (citing *Roger Miller Music, Inc. v. Sony/ATV Publishing, LLC*, 477 F.3d 383, 395 (6th Cir. 2007)); *see also Howe*, 801 F.3d at 741 (quoting *Entm't Prods.*, 721 F.3d at 742) (stating that reconsideration requires "new evidence").

Second, the Government's Motion attempts to force the Court into a decision on the merits (whether the Government failed to warn) under the guise of a decision on jurisdiction (whether the Government complied with directives to warn). The Court should not decide this issue while the litigation is in its infancy and substantive discovery has not yet begun. "[T]he authority of the judge to dismiss an action for lack of jurisdiction [']obviously is not unlimited, and its limits ought to be ascertained and observed, lest, under the guise of determining jurisdiction, the merits of the controversy between the parties be summarily decided without the ordinary incidents of a trial . . . .'" *Fireman's Fund Ins. Co. v. Railway Exp. Agency, Inc.*, 253 F.2d 780, 783 (6th Cir. 1958) (quoting *Smithers v. Smith*, 204 U.S. 632, 645 (1907)). The Court has discretion about what information to consider in a factual challenge to subject matter jurisdiction. *Cartwright v. Garner*, 751 F.3d 752, 759–60 (6th Cir. 2014) (citing *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir.1994). When a ruling on jurisdiction "is dependent on decision of the merits," the Court should decide that issue at trial after the benefit of discovery. *Land v. Dollar*, 330 U.S. 731, 735 (1947); *see also Wojton v. United States*, 199 F. Supp. 2d 722, 729 (S.D. Ohio 2002).

Discovery is important in this case because the Government's facts are based on self-serving Declarations by its own employees, and meaningful discovery has not been conducted. At trial, the factfinder will be required to consider the facts as supported by the evidence and determine whether the Government satisfied its duty to warn under the Fire Management Plan.

That inquiry should not be undertaken now.

Further discovery is required to elucidate the facts of this case. The Government claims to have conducted interviews and press briefings on Monday, November 28 and Tuesday, November 29, but the full contents of these media events have not been provided. [2d MTD at 13–14; Doc. 49-3 at 5–6; Doc. 49-4 at 7]. Management Assistant Dana Soehn's Declaration states that a different employee, Molly Schroer (who did not supply her own declaration), "respond[ed] to email and phone inquiries from media outlets" on Monday, November 28, but it does not specify how many such inquiries were fielded or even establish whether Soehn had personal knowledge of this matter. [Doc. 49–3 ¶ 9].[5] And Public Information Officer Warren Bielenberg claims, among other things, to have personally spoken to 250 to 300 local residents on Sunday, November 27, but no discovery has confirmed that claim. [2d MTD at 10; Doc. 49–4 ¶ 11].

## III. The Government's Own Facts Show It Failed to Warn Park Neighbors

Even given the self-serving Declarations of its employees, the Government failed to comply with the directives of the Fire Management Plan. The Government simply has not refuted Plaintiffs' allegations that it failed to warn Plaintiffs and others about the imminent danger to Gatlinburg, Pigeon Forge, and other communities.

Much of the factual recitation in the Government's Motion is repetitive of the Complaint and attachments, which were of course presented to the Court in the previous motion practice. [*Id.* at 9–15]. As the Complaint describes, the Government published press releases on Wednesday, November 23, and Friday, November 25. The Park made no communication of any kind from Saturday morning, November 26, until Monday morning, November 28. And the press

---

[5] The Government's brief states that Schroer was responsible for "communicating with media outlets through email and phone about the fire." [2d MTD at 11]. The Declaration providing that information, however, is narrower.

releases that were issued failed to warn Plaintiffs and others of the danger posed by the fire. [*See also* Statement of Facts, *supra*].

Additionally, the Government states that the Park posted fire-related updates on social media starting on the morning of Monday, November 28. [2d MTD at 11; Doc. 49-3 at 30–58]. These social media posts simply repeat the information contained in the press releases described above. No social media of any kind was published from Wednesday, November 23, until Monday, November 28. Thus this new information does not provide any further support for the Government's position that it warned Park neighbors.

The Government also points to press briefings and interviews that it conducted on Monday, November 28 and Tuesday, November 29. [2d MTD at 13–14; Doc. 49-3 at 5–6; Doc. 49-4 at 7]. As explained above, the full contents of these media appearances has not been made available to Plaintiffs or the Court, but Soehn acknowledges that at one press briefing she merely read from a press release. [Doc. 49-3 ¶ 12]. Additionally, many of these media events occurred after the fire had reached already Gatlinburg. [2d MTD at 14]. In fact, the Government appears to admit that it was not until 7:00 PM on Monday that the Park announced that the fire had reached Gatlinburg. [2d MTD at 14; Doc. 49-3 ¶ 17].

Other facts also fail to demonstrate that the Government complied with Fire Management Plan directives to warn neighboring communities. A press release issued between 11:35 and 2:00 on Monday, November 28 announced a fire 150 yards behind the Twin Creek Picnic Pavilion and stated, "State and local fire departments have been alerted to respond as needed to potential threats to private properties along the park boundaries including Gatlinburg and Pittman Center." [Doc. 49-3 at 15]. Another press release issued at 2:00 PM called the fire "very unpredictable" but still failed to offer any warning to neighboring communities. [Doc. 49-3 at 16–17]. A further

press release issued at 6:15 PM reported additional fire activity and road closures. [2d MTD at 14; Doc. 49-3 at 18]. The Government also posted information about road closures on the Park website. [*Id.* at 9–10; Doc. 49-3 at 21–28]. Despite the Government's (improper and premature) attempt to bring these facts to the Court's consideration, the truth remains that the Government failed to warn Plaintiffs and others of the imminent danger caused by the Chimney Tops 2 fire.

The fire was first discovered on Wednesday, November 23, 2016. [Compl. ¶¶ 95, 99]. There was no warning that the fire might reach surrounding communities. The fire spread on Thursday and Friday. [*Id.* ¶¶ 128, 135]. Again, no warning was issued. On Saturday the National Weather Service had issued a forecast predicting strong winds. [*Id.* ¶¶ 146, 149]. Once again, the Government failed to warn the surrounding communities.

By Saturday at least, the Government should have known that the fire was prone to spread to Gatlinburg, Pigeon Forge, and other residential areas as shown by the Park calling for air support to directly attack the fire. Before sunrise, a computer model by a Park employee led to the conclusion that "any fires that were out there [were expected] to spread," and a weather forecast had predicted strong winds blowing towards Gatlinburg. [*Id.* ¶¶ 146, 149]. An additional forecast with similar predictions was issued that afternoon. [Doc. 1-5 at 61]. Despite having this information, air support was ordered on Saturday, November 26, but not utilized until Sunday, November 27. [Answer ¶ 24; *Anculle* Answer ¶ 88; Compl. ¶ 157]. Further, no press release was issued at all on this date. [Compl. ¶ 385].

By Sunday, signs were even more dire. Weather forecasts that day *specifically predicted "enhanced fire danger" as well as strong winds and "critically dry conditions."* [*Id.* ¶¶ 161, 163]. Air support finally arrived but failed to extinguish the fire and had little effect at all. [*Id.* ¶ 157]. Inexplicably, the Government still neglected to issue a warning to Park neighbors or local

residents. It did not even contact the Gatlinburg Fire Department. [*Id.* ¶ 165].

Overnight from Sunday to Monday, the fire grew *at least six times in size*. [*Id.* ¶ 186]. Rather than contact any Gatlinburg official, The Park waited for the Gatlinburg Fire Department to contact it, and even then refused its help. [*Id.* ¶¶ 193–94]. At 11:20 AM that morning, the Government issued a press release, but rather than use that press release to warn neighboring areas, it minimized the problem, saying "*The fire currently poses no immediate threat to . . . any areas outside of park boundaries including Gatlinburg, Pittman Center or Cosby.*" [Id. ¶ 386 (emphasis added)]. This press release was issued within hours of the fire reaching Gatlinburg. [*Id.* ¶¶ 225, 229]. The Government makes no attempt to explain away that tragic decision.

Despite all the Government's attempted explanations, it cannot hide the fact that it did not even attempt to warn Plaintiffs or others of the fire's potential to reach Gatlinburg until 3:40 PM on Monday, [*id.* ¶ 387], just three hours before the first reported fire there. [*Id.* ¶ 229].

The Government was required to notify "Park neighbors, Park visitors and local residents . . . of all planned and unplanned fire management activities that have the potential to impact them." [Fire Management Plan § 3.3.2(C) at p. 28]. It was required to "protect values at risk and to ensure the safety of park staff and visitors as well as the neighboring public," by "[p]ost[ing] current fire information on websites as available" and "[i]nform[ing] park neighbors of wildland fires." [*Id.* § 4.4.2(F) at p. 55]. Because of the Government's failure, Plaintiffs suffered incredible property damage and lost their loved ones forever. The Government should answer for its failures. The discretionary function exception offers no shield.

17


# CONCLUSION

For the foregoing reasons, Plaintiffs request the Court deny the Government's Renewed Motion to Dismiss.

This, the 26th day of March, 2020.

                              Respectfully submitted:

                              /s/ *Sidney W. Gilreath*
                              SIDNEY W. GILREATH
Attorney at Law
Gilreath & Associates, P.L.L.C.
Bank of America Center
550 Main Avenue
Suite 600
Knoxville, Tennessee 37902
Telephone: (865) 637-2442
Email: GilKnox@SidGilreath.com

GORDON BALL
CHASE FANN
Attorneys at Law
Gordon Ball, LLC
7001 Old Kent Drive
Knoxville, Tennessee 37919
Telephone: (865) 525-7028
Email: GBall@GordonBall.com

THEODORE J. LEOPOLD
Attorney at Law
Cohen Milstein Sellers & Toll, PLLC
2925 PGA Boulevard
Suite 200
Palm Beach Gardens, Florida 33410-2909
Telephone: (561) 515-1400
Facsimile: (561) 515-1401
Email: TLeopold@CohenMilstein.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 26, 2020, I electronically filed the foregoing with the Clerk of Court via the Court's Electronic Filing System, which will provide electronic notification to all Filing Users. Any parties who are not Filing Users will be served with a paper copy of the foregoing by first-class mail, postage pre-paid.

/s/ *Sidney W. Gilreath*
SIDNEY W. GILREATH