IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| MICHAEL B. REED, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:18–CV–201 |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————————— | ) | |
| | ) | |
| BRITTANY N. HYRE ANCULLE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:18–CV–308 |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————————— | ) | |
| | ) | |
| BRITTANY ADKINS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:18–CV–310 |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————————— | ) | |
| | ) | |
| JAMES CARL VANCE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:19–CV–283 |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Defendant. | ) | |

1

```
                                              )
                                              )
JACKIE SUE BARNES, et al.,                    )
                                              )
        Plaintiffs,                           )
                                              )
v.                                            )    No. 3:19–CV–296
                                              )
UNITED STATES OF AMERICA                      )
                                              )
        Defendant.                            )
```

<u>MEMORANDUM OPINION AND ORDER</u>

**I.    Introduction**

On November 28, 2016, the Chimney Tops 2 Fire ("Fire"), the largest wildfire in the Great Smoky Mountains National Park's ("Park") history, left the Park's boundaries, burned the surrounding areas, and led to tragic losses of life and significant property damage. This case, and in particular this matter, is about the actions of the United States, the National Park Service ("NPS"), and their employees on the days leading up to and on November 28, 2016.

The actions of the United States, the NPS, and their employees are significant because several groups of plaintiffs have brought lawsuits under the Federal Tort Claims Act ("FTCA") seeking compensation from the United States for its alleged negligence in handling the Fire. The plaintiffs allege that the NPS did not follow its own policies when handling the Fire. In response to the lawsuits, the United States filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction and argued that the Court could not hear the case because the United States is immune from the lawsuits. This immunity, the United States argued, stems from the discretionary function exception to the FTCA. The discretionary function exception guards the United States against tort claims arising from "legislative and administrative decisions grounded in social, economic, and political policy." This Court disagreed and held that the NPS's Great Smoky Mountains National Park Fire Management Plan ("FMP"), in particular Section 3.3.2 and Table 13 of Section 4.4.2, mandated

2

that the NPS perform certain actions. Finding that the FMP did not leave discretion to the NPS, the Court ruled that the discretionary function exception did not apply and the Court denied the Motion to Dismiss.

Then, the United States filed a Renewed Motion to Dismiss for Lack of Subject Matter Jurisdiction. This time, the United States argues that even if the FMP contained mandatory actions, it took those actions, and the discretionary function exception still protects it. That Motion and other related motions are before this Court now.

The United States is only partially correct. It is correct that the United States can be immune from suit under the discretionary function exception if it performed mandatory actions, but, based on the evidence presented to the Court for consideration, it is wrong that it performed all of the mandatory conduct in the FMP. Because the United States did not perform the mandatory conduct, as explained in more detail below, the United States' Renewed Motion to Dismiss for Lack of Subject Matter Jurisdiction is DENIED.

## II.    Procedural Background

After Plaintiffs filed this FTCA action, the United States filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction. [Docs. 1, 23]. The Motion was a facial challenge to the Court's jurisdiction. [Doc. 23]. The United States argued that this Court did not have jurisdiction because the policies, actions, and decisions relating to the Chimney Tops 2 Fire fell within the discretionary function exception to the FTCA. [Doc. 23–1, PageID 1930–31]. Judge Thomas Phillips denied the Motion to Dismiss and ruled that Section 3.3.2 and Section 4.4.2, Table 13 of the Park's FMP required the United States to take required actions. [Doc. 41, PageID 3113–14]. Because the Motion was a facial attack, the facts of the case were not considered, and Judge Phillips did not determine whether the United States in fact took the required actions. [*See id.* at PageID 3098,

3100]. After the decision was entered, the case was transferred to the undersigned judge. [Doc. 47].

Now, the Court addresses the United States' Renewed Motions to Dismiss for Lack of Subject Matter Jurisdiction and related motion in five cases, listed below:

Renewed Motions to Dismiss:

Document 49, *Reed v. United States*, 3:18–CV–201;
Document 42, *Anculle v. United States*, 3:18–CV–308;
Document 42, *Adkins v. United States*, 3:18–CV–310;
Document 24, *Vance v. United States*, 3:19–CV–283;
Document 23, *Barnes v. United States*, 3:19–CV–296.

Motions for Leave to File Declaration of William Shory:

Document 78, *Reed v. United States*, 3:18–CV–201;
Document 63, *Anculle v. United States*, 3:18–CV–308;
Document 64, *Adkins v. United States*, 3:18–CV–310;
Document 42, *Vance v. United States*, 3:19–CV–283;
Document 41, *Barnes v. United States*, 3:19–CV–296.

Motions to Supplement Record with June 5, 2020, Sixth Circuit Opinion:

Document 83, *Reed v. United States*, 3:18–CV–201;
Document 68, *Anculle v. United States*, 3:18–CV–308;
Document 69, *Adkins v. United States*, 3:18–CV–310;
Document 47, *Vance v. United States*, 3:19–CV–283;
Document 46, *Barnes v. United States*, 3:19–CV–296.

Motions to Supplement Record with Memorandum of Understanding and Declaration of Greg Miller:

Document 85, *Reed v. United States*, 3:18–CV–201;
Document 70, *Anculle v. United States*, 3:18–CV–308;
Document 71, *Adkins v. United States*, 3:18–CV–310;
Document 49, *Vance v. United States*, 3:19–CV–283;
Document 48, *Barnes v. United States*, 3:19–CV–296.

The Motions, Memoranda of Law, Exhibits, Supplements, Responses, Replies, and Sur-Replies in the five cases are identical. The Renewed Motions to Dismiss and First Motion for

Leave to File Declaration were argued together on May 28, 2020. [Doc. 82].[1] Oral argument for the Motions to Supplement Record are unnecessary.

As indicated at oral argument, the Court will grant the Motions for Leave to File Declaration of William Shory. However, as seen below, the Court did not rely on the declaration of Mr. Shory when rendering its decision.

Similarly, although the United States opposes the Motion to Supplement Record with June 5, 2020, Sixth Circuit Opinion, the Court will grant it. Local Rule 7.1(d) permits a party to file a supplemental brief when there is a development in the case. Plaintiffs filed the Motion for Leave to File a Supplement to bring the Court's attention to a new case in the Sixth Circuit, *National Wildlife Federation v. United States*, 960 F.3d 872 (6th Cir. 2020). Therefore, the Motion is GRANTED.

On the other hand, the Court will deny the Motion to Supplement Record with Memorandum of Understanding and Declaration of Greg Miller. The United States responded in opposition. [Doc. 86]. Whether to permit a party to supplement the record is within the discretion of the district court. *See Hooks v. Hooks*, 771 F.2d 935, 946 (6th Cir. 1985). The Court previously told the Parties that "no further briefing will be necessary for this matter." [Doc. 76, PageID 3440]. This Motion is Plaintiffs' third filing on the Renewed Motion to Dismiss since the Court said that no more briefing was necessary. Further, the Memorandum of Understanding was signed by the NPS and the Gatlinburg Fire Department ("GFD") in January of 2015. [Doc. 85–1]. Plaintiffs do not provide any reason explaining why they filed this document over four months after their initial response and over two months after oral argument. [Doc. 85]. Further, after reviewing the

[1] Unless otherwise noted, references to document and page numbers are references to the *Reed*, 3:18–CV–201, docket.

5

document, it does not affect the disposition of this motion. Therefore, the Motion to Supplement Record with Memorandum of Understanding and Declaration of Greg Miller is DENIED.

Moving to the Renewed Motion to Dismiss, Defendant argues that the Renewed Motion is a factual challenge to subject matter jurisdiction and states that the previous decision denying the United States' facial attack was erroneous. [Doc. 49–1, PageID 3138, 3143]. Contrary to Defendant, Plaintiffs insist that the Renewed Motion is merely an attempt to get the Court to reconsider the previously rendered decision from Judge Phillips. [Doc. 61, PageID 3343]. Plaintiffs go as far to say that the previous Motion was also a factual attack because the Court cited documents outside the pleadings. [*Id.* at PageID 3343–44].

The Court agrees with the Defendant that this Motion is a Renewed Motion to Dismiss rather than a Motion to Reconsider. Defendant may bring motions regarding the Court's subject matter jurisdiction at any time. Fed. R. Civ. P. 12(h)(3); *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011). Also, it is a common practice for parties to bring a facial attack and then a factual attack under Rule 12(b)(1). *See Carlyle v. U.S., Dept. of the Army*, 674 F.2d 554, 556 (1982); *Stanford v. U.S.*, 992 F.Supp.2d 764, 770 (2014). Therefore, the Court will not construe the entire Renewed Motion as a Motion to Reconsider as argued by Plaintiffs.

As far as the United States' discusses the previous Order in this case being erroneous, the Court declines to reconsider the previous Order. A court may reconsider a previous order under federal common law or the Federal Rules of Civil Procedure. *Rodriguez v. Tennessee Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004). District "courts will find justification for reconsidering interlocutory orders when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Id.* Defendant has essentially remade its arguments from the facial attack.

6

Defendant's argument does not show a change in controlling law, new evidence, or a clear error in need of correcting. Therefore, as the Court indicated at oral argument, it will not revisit the previous order.

### III.    Relevant Factual Background

According to the Chimney Tops 2 Fire Review: Individual Fire Review Report, on November 23, 2016, the Fire Management Officer ("FMO")—who is revealed in other documents to be Greg Salansky—spotted a column of smoke at the Chimney Tops area of the Park. [Doc. 1, PageID 8; Doc. 1–5, PageID 166]. "Chimney Tops" is the name of two peaks in the Park. [ Doc. 1–5, PageID 166]. The northern peak is "Chimney Tops 2." [*Id.*]. FMO Salansky traveled to the area, and the fire appeared to come from the northeastern side of Chimney Top 2. [*Id.*]. He hiked to that side of the peak. [*Id.*]. There, he saw a "a creeping smoky fire in the dark of night and realized that hiking out to his current location put him in danger." [*Id.*]. FMO Salansky believed that he could not safely suppress the fire in the dark on the treacherous terrain. [*Id.*]. He thought that a fire crew would need to return during the day. [*Id.*]. Before leaving the area, FMO Salansky and another firefighter closed the trail to the Chimney Tops "to protect the public from the wildfire." [*Id.*].

At 9:12 p.m. that night, "the Park issued a press release that described the Fire as approximately 1.5 acres with slow rates of speed in an extremely remote, steep, and inaccessible terrain." [Doc. 49–1, PageID 3146; Doc. 49–3, PageID 3161, 3168]. The press release states that certain trails were closed, and that fire crews would start fire suppression the next day. [Doc. 49–3, PageID 3168]. This press release and all other press releases were sent to "more than 50 media outlets, 25 government entities, 50 private organizations, and other individuals." [*Id.* at PageID

3161]. The record does not indicate which media outlets, government entities, private organizations, or other individuals received this press release and future press releases.

The next day, on November 24, 2016, crews began scouting for "indirect fire lines" to suppress the fire. [Doc. 1–5, PageID 167]. These suppression lines would create a box using "natural and pre-existing features such as trails, drainage bottoms, and natural features that— within the local experience of the personnel involved—would hold the fire." [*Id.*]. However, crews did not begin to construct the indirect suppression lines until Sunday, November 27. [*Id.*].

Also, on November 24, the NPS posted updates about road closures on the "Temporary Road and Facilities Closures" webpage. [Doc. 49–1, PageID 3146–47; Doc. 49–3, PageID 3161]. This update stated that the Chimney Tops Trail, Sugarland Mountains Trail, Huskey Gap Trail, and Road Prong Trail were closed because of a wildfire. [Doc. 49–3, PageID 3181].

Then, on November 25, six firefighters continued to scout areas for containing the Fire. [Doc. 1–5, PageID 175]. The firefighters had difficulty finding suitable areas for containing the Fire because the area was "very steep, rugged, and unsuitable for effective fire line construction." [*Id.*]. Further, the Park issued another press release. [Doc. 49–3, PageID 3169]. The press release states that the Fire was a "3–acre wildfire" and "slow-moving . . . . " [*Id.*]. It goes on to say, "Park fire crews are establishing containment lines utilizing trails, drainages, and hand-built lines." [*Id.*]. Also on this day, the "Temporary Road and Facilities Closures" webpage stated that "Chimney Tops Trail and Road Prong Trail are closed due to wildfire." [Doc. 49–3, PageID 3183].

Very little changed on Saturday, November 26. FMO Salansky and other firefighters continued to scout the area. [Doc. 1–5, PageID 176]. FMO Salansky "estimated the [F]ire to be approximately 6–8 acres in size." [*Id.* at PageID 177]. Nothing in the record suggests that any press releases or social media updates went out on November 26. The only significant change on

8

November 26 was a weather report that "forecast[ed] high winds and rain for the afternoon/evening of Monday, November 28." [*Id.* at PageID 167].

The fire intensified on November 27, 2016, and the Park's response escalated. [*Id.*]. "A distinct smoke column could be seen from the surrounding towns of Gatlinburg and Pigeon Forge." [*Id.*]. On this day, FMO Salansky "ordered additional resources via phone calls to adjacent fire resource units." [*Id.*]. These resources included a fire module composed of seven to ten people, aircraft, fire engines, and a fire behavior analyst. [*Id.* at PageID 178–79]. The additional resources began to arrive at 7:00 p.m. [*Id.* at PageID 167]. Three helicopters were requested for support and "began dropping water on the fire's edge, which was still inaccessible to ground crews for direct attack without significant risk." [*Id.*]. FMO Salansky also called Warren Bielenberg and asked him "to serve as a Fire Information Officer . . . . " [Doc. 49–4, PageID 3220]. As Fire Information Officer, Mr. Bielenberg interacted with the public at overlooks along Newfound Gap Road. [*Id.* at PageID 3221]. Mr. Bielenberg was "to inform the public about the [F]ire, telling them that the Park was monitoring it and indirectly attacking it, and that it was too dangerous to fight the fire directly from the mountaintop." [*Id.*]. Mr. Bielenberg also attests to the use of signage along "key overlooks to inform the public about the fire." [*Id.*].

The Fire continued to spread on the next morning, on November 28, and "maintenance workers reported fire in the Chimneys Picnic Area north of the last known location of the fire." [Doc. 1–5, PageID 167]. At this point FMO Salasnky "estimated that the [F]ire had grown to approximately 250 to 500 acres." [*Id.*]. Then, crews spotted a fire approximately one mile from Chimney Tops 2. [*Id.*]. Also on that morning, Dana Soehn, a Park Management Assistant, asked "Molly Schroer, the Park's concession management specialist and a member of the management team, to collect information to include in press releases." [Doc. 49–3, PageID 3162]. Ms. Schroer

also "respond[ed] to email and phone inquiries from media outlets. [*Id.*]. Although she was the Park's concession management specialist, she had previously been a public affairs assistant and still served as a backup public information officer. [*Id.*]. In addition to Ms. Schroer's efforts, Ms. Soehn and Mr. Bielenberg worked to disseminate more information, including TV interviews and drafting press releases. [*Id.* at PageID 3163; Doc. 49–4, PageID 3223]. These press releases included information regarding the fire, high winds, and poor air quality. [Doc. 49–3, PageID 3163; Doc. 49–4, PageID 3223]. Ms. Soehn assisted Gatlinburg's Public Information Officer draft an E-Blast stating that Mynatt Park was under a voluntary evacuation because of the potential for the Fire to spread and that the Park and Gatlinburg would hold a press briefing. [Doc. 49–3, PageID 3164]. The E-Blast was "an electronic blast of information to media outlets and other organizations and individuals." [*Id.*]. At 4:00 p.m., Mr. Bielenberg also went to Gatlinburg to help the GFD develop talking points. [Doc. 49–4, PageID 3223]. During this time, Logan Bolden, a Park intern, also posted seventeen social media posts on Twitter, Facebook, and Instagram providing information about the Fire. [Doc. 49–3, PageID 3163].

On November 28, the "Temporary Road and Facilities Closures" webpage stated that several trails, campsites, and shelters were closed due to the fires. [*Id.* at PageID 3185]. The Park Service also released a press release stating, in part:

> Park fire crew numbers responding to the Chimney 2 Fire have continued to increase over the course of the weekend. Currently park firefighters have been joined by firefighters from Utah and additional support resources have been ordered including an incident management team along with 4 hand crews (total of 80 people) and air support. The additional crews are expected to begin to arrive Mon (11/28) and early Tue (11/29).

[*Id.* at PageID 3174].

According to the United States, which cites to the Complaint, "FMO Salansky contacted a Gatlinburg Fire Department ("GFD") Captain at 10:58 a.m. and explained "the potential for the

Fire's smoke to travel to the city.'" [Doc. 49–1, PageID 3148; Doc. 1, PageID 79]. Plaintiffs say that this was the "first communication of any kind between the Park and any Gatlinburg employee regarding a fire that had been burning—and growing—for six days." [Doc. 1, PageID 142]. Later that day, "Chief Ranger Kloster and Superintendent Cassius Cash traveled to GFD headquarters to brief GFD Chief Miller, Gatlinburg Police Department Chief Randy Brackens, and Gatlinburg City Manager Cindy Ogle on the progress of the Fire and its 'potential to leave the Park.'" [Doc. 49–1, PageID 3148; Doc. 1, PageID 83]. A meeting was also held at Mynatt Park, a location near the Park, with "various leaders," and "FMO Salansky recommended voluntary evacuations of the Mynatt Park area." [Doc. 49–1, PageID 3149; Doc. 1, PageID 84–85].

During these events, the predicted high winds arrived. They were stronger than anticipated, and "the Chimney Tops 2 Fire became the largest wildland fire in the history of Great Smoky Mountains National Park." [Doc. 1–5, PageID 167]. Around 6:00 p.m., "the [F]ire reached the park boundary and merged with other wildland fires, collectively referred to as the Sevier County Fires. With the wind event downing powerlines, which created additional fires, crews from various agencies involved struggled to contain the overall wildfire that now threatened populated areas." [*Id.*].

## IV. Previous Order Denying Defendant's First Motion to Dismiss

In the previous order denying Defendant's Motion to Dismiss, Judge Philips ruled that the NPS was required to perform particular conduct under Section 3.3.2 and Section 4.4.2, Table 13 of the Park's FMP. [Doc. 41, PageID 3113–14]. The specific directives listed in Section 3.3.2 of the FMP are "Firefighter and public safety is the first priority in all fire management activities," and "Park neighbors, Park visitors and local residents will be notified of all planned and unplanned fire management activities that have the potential to impact them." [Doc. 41, PageID 3109; Doc.

1–7, PageID 468]. Other directives in Table 13 of Section 4.4.2 required the NPS to "Post current fire information on websites as available[,] [i]nform park neighbors of wildland fires[,] [and u]se information officer and/or park public affairs to disseminate information . . . . " [Doc. 41, PageID 3110; Doc. 1–7, PageID 498]. The requirement to inform park neighbors of wildland fires in Table 13 are redundant considering the requirement in Section 3.3.2 to notify "Park neighbors, Park visitors and local residents . . . of all planned and unplanned fire management activities that have the potential to impact them." Therefore, if Section 3.3.2 is satisfied, it is likely that the requirement to inform park neighbors in Table 13 is also met.

Distilling these sections together, the NPS had to do three things. First, the NPS had to use an information officer or the park public affairs to disseminate information. Second, the NPS had to post current fire information on available websites. Third, the NPS had to notify and inform Park Neighbors, Park visitors, and local residents of "all planned and unplanned fire management activities that have the potential to impact them."

**V. Law**

The Federal Tort Claims Act allows lawsuits against the United States:

for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b); *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 535 (1988). However, there are "exceptions to this broad waiver of sovereign immunity," including the discretionary function exception. *Berkovitz*, 486 U.S. at 535; *see* 28 U.S.C. § 2680(a); *United States v. Gaubert*, 499 U.S. 315, 322 (1991). The Discretionary Function Exception, 28 U.S.C. § 2680(a) states:

Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such

12

statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

The Supreme Court has ruled that the discretionary function exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *Berkovitz*, 486 U.S. at 535–36 (quoting *United States v. Varig Airlines,* 467 U.S. 797, 808 (1984). The exception prevents "judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy . . . ." *Gaubert*, 499 U.S. at 323 (quoting *Varig Airlines*, 467 U.S. at 814).

The Court's previous order determining that the FMP contained mandatory directives does not end the analysis for the discretionary function exception. The United States can, counterintuitively, be shielded from liability for mandatory action under the discretionary function exception as long as it performed the mandatory action. *Id.* at 324. Under the FTCA, if the United States must act in a particular way and an "employee obeys the direction, the Government will be protected" from a lawsuit. *Id.*

This principle is shown in the case *Berkovitz by Berkovitz v. United States.* In *Berkovitz*, a child developed polio after being vaccinated, and the child's family brought a suit against the United States. *Berkovitz*, 486 U.S. at 533. The family argued that the Division of Biologic Standards ("DBS"), a part of the National Institutes of Health federal agency, gave a license to the manufacturer of the vaccine without examining the vaccine properly. *Id.* DBS's actions allegedly violated a regulation which stated: "[a] product license shall be issued only upon examination of the product and upon a determination that the product complies with the standards prescribed in the regulations . . . . " *Id.* at 542.

When deciding the matter, the Supreme Court could not precisely pin down what the family accused the United States of failing to do. *Id.* at 543. Based on the allegations, the Court believed that the plaintiff could be arguing that the United States violated the regulation in one of three ways. *Id.* First, the plaintiff could be stating that the United States granted the license "without first making a determination as to whether the vaccine complied with regulatory standards." *Id.* Second, the plaintiff could be arguing that the United States determined that the vaccine and its manufacturer failed to meet the regulatory standards and granted the license anyway. *Id.* Third, the plaintiff "may concede that the DBS made a determination of compliance, but allege that this determination was incorrect." *Id.*

The Supreme Court said that the plaintiffs could proceed in their lawsuit under the first and second hypotheticals. *Id.* at 544. This was because "[u]nder the scheme governing the DBS's regulation of polio vaccines, the DBS may not issue a license except upon an examination of the product and a determination that the product complies with all regulatory standards. The agency has no discretion to deviate from this mandated procedure." *Id.* (internal citations omitted). The first two hypotheticals would show "a failure on the part of the agency to perform its clear duty under federal law." *Id.* And the discretionary function exception does not apply when an agency failed "to act in accord with a specific mandatory directive . . . . " *Id.* at 543.

On the other hand, if the plaintiff was arguing the third hypothetical, that is, DBS erred in its analysis, then "the question turns on whether the manner and method of determining compliance with the safety standards at issue involve agency judgment of the kind protected by the discretionary function exception." *Id.* at 544–45.

## VI. Analysis

Here, based on Plaintiff's Complaint and in light of the first Motion to Dismiss, the question is similar to the first and second hypotheticals from *Berkovitz*. That is, the Court must determine if the NPS "perform[ed] its clear duty under federal law" and "failed to act in accord with a specific mandatory directive . . . ." *Berkovitz,* 486 U.S. at 544. The third hypothetical is not relevant here because Plaintiffs argue that the "the Government failed to comply with the directives of the Fire Management Plan," [Doc. 61, PageID 3355], instead of arguing that the United States complied but complied incorrectly. Therefore, if the NPS failed to perform its duty under the FMP and failed to act in accord with a specific mandatory directive, then the Renewed Motions to Dismiss must be denied, as the discretionary function exception does not apply. *Id.*

Usually, a motion to dismiss for lack of subject matter jurisdiction falls on the plaintiff to show jurisdiction. *Carlyle v. U.S., Dep't of the Army*, 674 F.2d 554, 556 (6th Cir. 1982). But the burden shifts after a plaintiff is victorious on a facial attack to subject matter jurisdiction and establishes based on the pleadings that conduct outside the discretionary function exception occurred. *Id.* Once the plaintiff has pleaded facts that are outside the discretionary function exception, the burden moves to the defendant if the defendant files a subsequent factual attack on subject matter jurisdiction. *Id.* The defendant must show that the exception should apply. *Id.*; *Stanford v. United States*, No. CIV. 12–93–ART, 2014 WL 2574492, at *9 (E.D. Ky. June 9, 2014) ("Although the Courts of Appeals are split on the issue, according to the Sixth Circuit, once an FTCA plaintiff pleads conduct outside the DFE's scope, the burden shifts to the government to prove the DFE actually applies."). The burden shifts because the discretionary function exception is essentially an affirmative defense at this point in the litigation, and the United States is in the best position to assert a FTCA exception. *Stanford*, 2014 WL 2574492, at *9 (E.D. Ky. June 9, 2014) (citing *Prescott v. United States,* 973 F.2d 696, 702 (9th Cir.1992)).

15

When the United States files a factual attack on subject matter jurisdiction, "the district court has broad discretion over what evidence to consider and may look outside the pleadings to determine whether subject-matter jurisdiction exists." *Adkisson v. Jacobs Eng'g Grp., Inc.*, 790 F.3d 641, 647 (6th Cir. 2015) (citing *Cartwright v. Garner,* 751 F.3d 752, 759 (6th Cir.2014)). Further, "the district court must weigh the conflicting evidence to arrive at the factual predicate that subject-matter does or does not exist." *Gentek Bldg. Prod., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007).

In sum, the United States has the burden on this motion and must point to evidence in the record to support its assertion of the discretionary function exception to the FTCA. The United States can do this by showing that it performed the mandatory conduct in Section 3.3.2 and Table 13 in the FMP.

      1.     <u>Based on the record, has the United States met its burden and showed that the National Park Service used an information officer or the park public affairs to disseminate information?</u>

Yes. Table 13 of Section 4.4.2 of the FMP required the NPS to use an information officer or the park public affairs to disseminate information. The United States has offered into evidence two declarations that state that an information officer, Warren Bielenberg, was utilized. [Docs. 49–3, 49–4]. He went to overlooks to discuss the Fire with visitors and eventually went to Gatlinburg to assist local officials. [Doc. 49–4, PageID 3222]. Similarly, the Park's public affairs was utilized when Dana Soehn, Molly Schroer, and Logan Bolden issued press releases, made media appearances, and posted information on the Park's websites. [Doc. 49–3].

Plaintiffs do not provide any evidence contradicting the evidence put forth by the United States on this issue. Therefore, this Court finds that the United States performed the mandatory

conduct set out in Section 4.4.2, Table 13 of the FMP requiring the NPS to use an information officer or the park public affairs to disseminate information.

2. <u>Based on the record, has the United States met its burden and showed that the National Park Service posted current fire information on available websites?</u>

Yes. Section 4.4.2, Table 13 of the FMP requires the NPS to "post current fire information on websites as available." The NPS posted updates regarding fire information on several websites, including its road and facilities closure page, Instagram, Facebook, and Twitter. [Doc 49–3, PageID 3162–63]. Plaintiffs do not provide any evidence contradicting this evidence. While there is certainly an argument that the NPS could have provided more information or posted more frequently, Plaintiffs have argued that the NPS "failed to comply with the directives of the Fire Management Plan," not that the NPS performed the conduct but performed that conduct incorrectly. Based on the record before it, this Court finds that the United States performed the mandatory conduct set out in Section 4.4.2, Table 13 of the FMP requiring the NPS to post current fire information on websites.

3. <u>Based on the record, has the United States met its burden and showed that the National Park Service notified or informed Park Neighbors, Park visitors, and local residents of "all planned and unplanned fire management activities that have the potential to impact them"?</u>

No. Section 3.3.2 of the FMP states "Park neighbors, Park visitors and local residents will be notified of all planned and unplanned fire management activities that have the potential to impact them." Akin to Section 3.3.2, Table 13 of Section 4.4.2 requires the NPS to "[i]nform park neighbors of wildland fires . . . . "

The United States argues that the NPS performed this conduct when it issued press releases and an E-Blast, used social media and other websites, and when FMO Salansky and other Park

17

leaders discussed the fire with Gatlinburg officials on November 28. [Doc. 49–1, PageID 3145–3149]. These facts and arguments are not persuasive.

First, while the United States contends that the press releases and an E-Blast satisfy the requirements, the United States did not provide the Court with the list of individuals and entities that received the press releases or E-Blast. The United States only says that the press releases were sent "to the Park's list of press release recipients, which included more than 50 media outlets, 25 government entities, 50 private organizations, and other individuals." [49–3, PageID 3161]. With the press releases, the NPS only gave notice of the fires to the people who receive their press releases. Likewise, the E-Blast was sent by the City of Gatlinburg and sent "to media outlets and other organizations and individuals." [Doc. 49–1, PageID 3150]. The United States cannot rely on the press releases and an E-Blast to satisfy a requirement to notify "Park Neighbors, Park visitors, and local residents" when it doesn't tell the Court where the press releases and E-Blast were sent to.

Likewise, the United States relies on the information posted to websites and social media accounts to satisfy the requirement. The problem with this argument is the same as the problem with the press release and E-Blast argument. The information posted on the websites gave notice to the visitors of the Park's website, the Instagram posts may have given notice to the people who follow the Park on Instagram, etc. But posting information on websites and social media accounts is not the same as notifying "Park neighbors, Park visitors and local residents . . . of all planned and unplanned fire management activities that have the potential to impact them."

This leaves the United States' last argument. The last argument centers on communications between the Park's leadership and Gatlinburg officials. Missing from the briefs and submissions are any declarations or deposition testimony from any of those individuals.

The brief from the United States says that "once FMO Salansky determined that smoke from the Fire had 'the potential to impact' the City of Gatlinburg, FMO Salansky contacted the GFD to notify it of this potential. *See* FMP § 3.3.2." [Doc. 49–1, PageID 3149]. The United States cites to the FMP to support a statement about FMO Salansky's thought processes and actions, but the FMP isn't evidence of FMO Salansky's thought processes and actions. Similarly, instead of getting declarations or depositions for communications between FMO Salansky, Chief Ranger Kloster, Superintendent Cassius Cash and Gatlinburg officials, the United States cites to Plaintiffs' Complaint. [Doc. 49–1, PageID 3149]. But the FMP and Plaintiffs' complaint are not evidence for conversations held by Park and city officials and thought processes of the Park's leadership.

Further, even if the Court were to accept the statements in the United States' brief as true, there are myriad, significant planned and unplanned fire events that the United States does not say that it notified "Park Neighbors, Park visitors, and local residents" about in those conversations. Just a small, non-exclusive list include, spotting the fire, scouting for indirect fire lines but not starting on them, the fire spreading over multiple acres, and calling in air support.

Because the United States has not entered into the record any evidence that could satisfy the requirement to notify Park Neighbors, Park visitors, and local residents of "all planned and unplanned fire management activities that have the potential to impact them[,]" this Court finds that the United States did not perform mandatory actions as required by Section 3.3.2 of the FMP and Section 4.4.2, Table 13 of the FMP.

4.    Conclusion

This Court previously held that the NPS was required to take mandatory action under Section 3.3.2 and Section 4.4.2, Table 13 of the Fire Management Plan. Under the Sixth Circuit law for renewed, factual attacks on subject matter jurisdiction, the United States had the burden to show that it performed the mandatory actions and satisfied the requirements of the FTCA and the

discretionary function exception. The United States failed to carry that burden because it did not provide evidence showing that it performed required conduct. For that reason, the Renewed Motion to Dismiss is DENIED.

**VII.    Conclusion**

For the above stated reasons, the following Renewed Motions to Dismiss are DENIED:

Document 49, *Reed v. United States*, 3:18–CV–201;
Document 42, *Anculle v. United States*, 3:18–CV–308;
Document 42, *Adkins v. United States*, 3:18–CV–310;
Document 24, *Vance v. United States*, 3:19–CV–283;
Document 23, *Barnes v. United States*, 3:19–CV–296.

The following First Motion for Leave to File Declaration of William Shory are DENIED:

Document 78, *Reed v. United States*, 3:18–CV–201;
Document 63, *Anculle v. United States*, 3:18–CV–308;
Document 64, *Adkins v. United States*, 3:18–CV–310;
Document 42, *Vance v. United States*, 3:19–CV–283;
Document 41, *Barnes v. United States*, 3:19–CV–296.

The following Motions to Supplement Record with June 5, 2020, Sixth Circuit Opinion are DENIED:

Document 83, *Reed v. United States*, 3:18–CV–201;
Document 68, *Anculle v. United States*, 3:18–CV–308;
Document 69, *Adkins v. United States,* 3:18–CV–310;
Document 47, *Vance v. United States*, 3:19–CV–283;
Document 46, *Barnes v. United States*, 3:19–CV–296.

The following Motions to Supplement Record with Memorandum of Understanding and Declaration of Greg Miller are DENIED:

Document 85, *Reed v. United States*, 3:18–CV–201;
Document 70, *Anculle v. United States*, 3:18–CV–308;
Document 71, *Adkins v. United States*, 3:18–CV–310;
Document 49, *Vance v. United States*, 3:19–CV–283;
Document 48, *Barnes v. United States*, 3:19–CV–296.

The Clerk of Court is DIRECTED to file this Memorandum Opinion and Order in all five of the listed cases.

So ordered.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE
