# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | |
|---|---|---|
| MICHAEL B. REED, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:18-CV-00201 |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| BRITTANY ADKINS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:18-CV-00310 |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |
| BRITTANY N. HYRE ANCULLE et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:18-CV-00308 |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| JAMES CARL VANCE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:19-CV-00283 |

Case 3:20-cv-00149-JRG-CRW   Document 248   Filed 03/31/26   Page 1 of 25
PageID #: 9221

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| JACKIE SUE BARNES, et al., | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | No. 3:19-CV-00296 |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| PAUL ABBOTT, et al., | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | No. 3:20-CV-00149 |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| ALLSTATE FIRE AND CAS. INS. CO., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:19-CV-00474 |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| AMERICAN RELIABLE INS. CO. et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |

|                                         |     |                    |
|-----------------------------------------|-----|--------------------|
| v.                                      | )   | No. 3:19-CV-00469  |
|                                         | )   |                    |
| UNITED STATES OF AMERICA                | )   |                    |
|                                         | )   |                    |
| Defendant                               | )   |                    |
|                                         | )   |                    |

STATE FARM FIRE & CAS. CO. et al.,  )

Plaintiffs,  )

v.  )  No. 3:19-CV-00470

UNITED STATES OF AMERICA  )

Defendant.  )

UNITED SERVICES AUTOMOBILE ASSOCIATION, et al.,  )

Plaintiffs,  )

v.  )  No. 3:19-CV-00472

UNITED STATES OF AMERICA  )

Defendant.  )

AUTO-OWNERS INS. CO., et al.,  )

Plaintiffs  )

v.  )  No. 3:19-CV-00478

UNITED STATES OF AMERICA  )

Defendant.  )

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the Government's most recent motion to dismiss for lack of subject matter jurisdiction based on the discretionary function exception to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(a) [Doc. 273].[1] As discussed below, the motion will be **GRANTED.**

## I.    FACTUAL BACKGROUND

### A.    Wednesday, November 23, 2016

In 2016, Greg Salansky was serving as the Fire Management Officer ("FMO") at the Great Smoky Mountains National Park near Gatlinburg, Tennessee, (the "Park"). On the afternoon of November 23, 2016, he became aware of a fire on the second spire of the popular Chimney Tops hiking trail ("the Fire"). [Salansky Dep., Doc. 293-1 at 132]. Around 5:00 p.m., he went to observe the Fire. [*Id*. at 134–35, 137]. From what he could see, it was approximately 1.5 acres and had "very minimal activity." [*Id*. at 135; Jordan Dep., Doc 293-2 at 74]. Salansky concluded that the Fire could affect trail closures. [Salansky Dep., Doc. 293-1 at 139–140]. He did not believe there was a potential for the fire to affect Park Neighbors. [*Id*.].

Later that night, at the direction of Chief Ranger Steven Kloster, Management Assistant Dana Soehn disseminated a press release, describing the size and location of the Fire and stating that as a result, several trails were closed. [Gov't Att. 26, Doc. 273-34 at 2–3]. According to the release, park fire crews were going to "initialize fire suppression efforts tomorrow morning." [*Id*.]. This press release was disseminated to the Park's Media List, which included various media outlets (television stations, newspapers, local digital news platforms, and radio stations); public officials

---

[1]Unless otherwise noted, all ECF record citations are to the lead case, *Reed et al. v. United States*, 3:18-CV-00301. All page-specific citations reference the ECF-assigned page number.

4

who served as Soehn's "point person[s] in those communities," such as the public affairs officer for the Gatlinburg Chamber of Commerce and City of Gatlinburg, Marci Claude; local tourism boards; and Park staff who interact with Park visitors. [Soehn Dep., Doc. 293-3 at 179–86, 188–94; Gov't Att. 27, Doc. 273-35]. The trail closures from the November 23 press release were posted on the Park's website. [Gov't Att. 28, Doc. 273-36 at 4]. And Park staff decided to include warnings about the Fire on variable message signs at the affected trailheads along Newfound Gap Road (U.S. Highway 441) and at Park Headquarters. [Jordan Dep., Doc. 293-2 at 73, 303–04; Gov't Att. 25, Doc. 273-33 at 13].

### B.      Thursday, November 24, 2016

On the morning of November 24, Salansky hiked back to Chimney Tops 2 Spire to observe the Fire. [Salansky Dep. Doc. 293-1 at 149]. He estimated that the Fire was approximately two acres in size and determined that it was "smoldering and creeping" downhill with minimal spread and "very slow growth." [Gov't Att. 29, Doc. 273-37 at 4; Jordan Dep., Doc. 293-2 at 79]. At this point, Salansky was focused on "the Park Service folks inside the Park . . . because that was what initially had potential to affect." [Salansky Dep., Doc. 293-1 at 162–63]. He saw "no threat or no potential" for the Fire to affect the public outside the Park. [*Id.*].

That day crews began scouting for "indirect fire lines" to suppress the Fire. [Nat'l Park Service Report, Doc. 1-5 at 4]. These suppression lines would create a box using "natural and pre-existing features such as trails, drainage bottoms, and natural features that—within the local experience of the personnel involved—would hold the fire." [*Id.*]. However, crews did not begin to construct the indirect suppression lines until Sunday, November 27. [*Id.*].

Chief Ranger Kloster and Salansky installed informational boards at pullouts, in case the Fire became more active later that day or the next. [Gov't Att. 28, Doc. 273-36 at 4]. Park officials

5

decided not to issue any press releases or notices regarding the Fire because Soehn had not received any calls from the public asking for information. [Gov't Att. 29, Doc. 273-37 at 3–4].

### C.      Friday, November 25, 2016

On Friday morning, Salansky reported to Park Deputy Superintendent Clayton Jordan, Kloster, and Soehn, that the Fire had grown to approximately three acres. [Salansky Dep., Doc. 293-1 at 179]. At this point in time, Salansky still did not think there was a potential for the Fire to spread beyond the Park. [*Id*. at 183]. Firefighters continued to scout areas for containing the Fire but had difficulty doing so because of the area's steep, rugged terrain. [Nat'l Park Service Report, Doc. 1-5 at 12].

The Park issued a second press release to the Park's media list, reporting that the Chimney Tops Trail remained closed due to the approximately three acre "slow-moving, backing fire." [Gov't Att. 26, Doc. 273-34 at 4]. The release stated that the Park was "experiencing extremely dry conditions" and that Park fire crews were "establishing containment lines utilizing trails, drainages, and hand-built lines." and that the Fire was visible from overlooks along Newfound Gap Road. [*Id*.].  Information regarding trail closures was posted on the Park's website. [Gov't Att. 28, Doc. 273-36 at 5]. Salansky also installed additional signs and information boards to inform Park visitors about trail closures. [Gov't Att. 30, Doc. 273-38 at 2].

### D.      Saturday, November 26, 2016

On Saturday, Park Officials continued to monitor the Fire, which had grown to approximately six to eight acres. [Gov't Att. 1, Doc. 273-9 at 5]. Salansky and other firefighters continued to scout the area. [Nat'l Park Service Report, Doc. 1-5 at 13]. A four-day Near Term Fire Report projected that the Fire could exceed the containment box, crossing Highway 441, toward Gatlinburg. [Kloster Dep. 293-4 at 279–81; Salansky Dep., Doc. 293-1 at 337–39].

6

Salansky was aware of the report and that winds of 35 to 50 mph with gusts over 60 mph were predicted for Monday night through Tuesday. [Gov't Att. 1, Doc. 273-9 at 8; Salansky Dep., Doc. 293-1 at 239]. He texted Chief Ranger Kloster:

> No line was constructed. The plan is to monitor and hope it does not come that far. But high winds are predicted for Monday, 30 to 40 miles an hour, with rain behind hopefully. So Sunday night and Monday may get exciting.

[Salansky Dep., Doc. 293-1 at 311]. However, the Fire continued to be "really low," and "smoldering," with "very little activity." [Jordan Dep., Doc. 293-2 at 124]. Given the Fire's small size and slow movement, Salansky determined the Fire only posed a threat to places and people within the Park. [Salansky Dep., Doc. 293-1 at 381].

### E.	Sunday, November 27, 2016

On Sunday, the Fire grew from about 10 acres to approximately 35 acres in size. [Jordan Dep. Doc. 293-2 at 133]. A distinct smoke column could be seen from the surrounding towns of Gatlinburg and Pigeon Forge. [Nat'l Park Service Report, Doc. 1-5 at 4]. The Fire remained approximately 5.5 miles away from the City of Gatlinburg. [Jordan Dep., Doc 293-2 at 148]. And Park staff still considered it to be a slow, backing fire with "very little growth." [*Id.* at 131]. However, high winds continued to be forecast for Monday. Salansky received a photo of the Fire via text message from Shane Paxton, a wildland fire module leader who was off duty. [Salansky Dep. Doc. 293-1 at 155] The men then engaged in a text exchange:

> Salansky: Looks worse than it is. But when the wind hits. Not sure what this thing will do.
>
> Paxton: On the bright side it will take out bug kill. On the dim side, expect to have long range spotting. I'd be prepared to shut down the road. The spots are an absolute threat . . .
>
> Salansky: Copy. Have been thinking about possible road closures . . .

7

[*Id.* at 156–57]. In another text exchange, Salansky told a potential volunteer: "Tomorrow is going to be interesting with 60-mile-per-hour-gusts predicted." [*Id*. at 316]. He also sent emails in which he stated, "Hopefully we can hold [the Fire] tomorrow based on wind events," and "We will have our hand[s] full as this wind event comes about tomorrow." [*Id*. at 235–36].

Salansky made requests for additional firefighters and equipment. [Nat'l Park Service Report, Doc. 1-5 at 15–16]. Three helicopters were requested for support and began dropping water on the Fire's edge, which was still inaccessible to ground crews for direct attack without substantial risk. [*Id.*]. Salansky also enlisted Warren Bielenberg, a retired National Park Service Park Ranger, to serve as a public information officer. [Bielenberg Decl., Doc. 273-24 at 5]. Bielenberg's role was to "interact with the public at the popular overlook areas on Newfound Gap Road," and to inform the public about the Fire. [*Id*. at 6]. Bielenberg notified approximately 250 to 300 people in person about the Fire. [*Id*.].

The Park Service did not issue any press releases, public safety advisories, or social media updates regarding the Fire on Sunday. Soehn, Kloster, and Jordan exchanged text messages discussing whether an additional "media update" was necessary but ultimately determined that because Soehn had not received any media inquiries that day, it was not necessary to send out an additional press release. [Gov't Att. 22, Doc. 273-30 at 9–11].

### F. Monday, November 28, 2016

On Monday, the situation dramatically worsened. In the early morning, Salansky received an urgent weather message that forecasted a hazardous high wind event with "[s]ustained wind speeds of at least 40 miles per hour and/or gusts of 58 miles per hour or stronger." [Salansky Dep., Doc. 293-1 at 244–45]. By 7:00 a.m., the Fire had grown to over 100 acres and Park staff learned that it had spotted to the Chimneys Picnic Area, which was about half a mile outside the

8

containment area. [Jordan Dep., Doc. 293-2 at 149–50]. Jordan and Kloster drove to the picnic area to assess the Fire and quickly realized the Fire exceeded the resources the Park had available. [Kloster Dep., Doc. 293-4 at 243–44]. Jordan was aware at this time that the possibility was rising that the Fire would impact surrounding neighborhoods. [Jordan Dep. Doc. 293-2 at 152]. Kloster ordered the closure of Highway 441, which is one of the only two ways to exit Gatlinburg. [Kloster Dep., Doc. 293-4 at 242].

At approximately 8:35 a.m., Kloster and Jordan returned to Park headquarters to have a management meeting where they decided to issue a press release "shutting down much of the Park." [Gov't Att. 26, Doc. 273-34 at 5.] According to Soehn, who attended the meeting, they determined it was "most likely if there was going to be a ground spread of this fire, it would be the Gatlinburg community specifically" so they agreed upon a plan whereby they would each personally connect to a "peer" in the Gatlinburg community. [Soehn Dep., Doc, 293-3 at 91].

By 9:00 a.m., the Gatlinburg Fire Department ("GFD") began receiving emergency calls from members of the public about the smoke and falling ash. [Miller Decl., Doc. 293-6 at 5]. GFD Captain David Puckett, who was the wildfire coordination captain for the GFD, called Salansky, but did not reach him. [Id.] At the time, Salansky was out assessing the Fire in an area where he did not have cell phone coverage. [Salansky Dep., Doc. 293-1 at 252–53].

At 10:37 a.m., the Park issued a press release announcing road and trail closures. [Gov't Att. 26, Doc. 273-34 at 4]. The notice explained that the Fire, which had grown to approximately 500 acres overnight, was moving northeast and had spotted across the Chimney Tops and Bullhead Ridge areas. [Id.]. In addition, the release stated that fire crews were currently working on suppression efforts, "to ensure public safety and protect park facilities" and advised that helicopters had dropped water throughout the area on Sunday, in an effort to suppress the fire. [Id.

9

at 5–6]. The press release was distributed to the same media distribution list described above, which included all local news and radio stations. [Gov't Att. 27, Doc. 273-35 at 180–81]. Local news stations began reporting updates from the Park starting around 11:00 a.m. [Gov't Att. 33, Doc. 273-41].

Around 11:00 a.m., Kloster and Jordan drove to the Gatlinburg Fire Department to notify Chief Miller regarding the status of the Fire. [Kloster Dep., Doc. 293-4 at 44]. Additionally, around this time, Park staff members contacted local officials in Gatlinburg. [*Id.* at 49–52]. Salansky returned the missed call from GFD Captain Puckett and briefed him on the status of the Fire. [Salansky Dep. Doc. 293-1at 253]. Park Superintendent Cassius Clay contacted City Manager Cindy Ogle. [Gov't Att. 1, Doc. 273-9 at 16]. And Soehn called the City's Public Relations Manager, Marci Claude. [Soehn Dep., Doc. 293-3 at 227; Claude Dep., Doc. 293-7 at 22]. Park Officials also provided information about the Fire to Sevier County Emergency Management Director John Mathews. [Gov't Att. 35, Doc. 273-43 at 2–3].

The Park issued another press release at 11:20 a.m., warning that an air quality advisory was in place, "especially in the Gatlinburg area, due to heavy smoke from the nearby Chimney 2 Fire." [Gov't Att. 26, Doc. 273-34 at 7]. The notice further stated that "[t]he fire currently poses no immediate threat to structures at LeConte Lodge or any areas outside of park boundaries including Gatlinburg [.]" [*Id.*].

At approximately 11:35 a.m., Park officials learned that the Fire had spotted to the Twin Creeks area of the Park, which is approximately one-and-a-half miles from the Park's border with Gatlinburg. [Salansky Dep., Doc 293-1 at 257]. Salansky contacted GFD and asked them to respond to the Fire pursuant to a mutual aid agreement. [*Id.* at 260.] At approximately 12:00 p.m., Park officials, including Salansky and Kloster, met with officials from the City of Gatlinburg and

neighboring communities in Mynatt Park, the closest neighborhood outside Park boundaries to the Twin Creeks area. [*Id.* at 260–61]. The meeting attendees included Gatlinburg Police Chief Randy Brackins, members of the GFD including Captain Puckett, City Manager Ogle, the chief of neighboring Pigeon Forge Fire Department, Salansky, Kloster, Cash, and Jordan, among others. [*Id.*].

At 12:44 p.m. the Park issued a press release stating that due to erratic winds, more fire growth was expected. [Gov't Att. 26, Doc. 273-34 at 8]. According to the release, state and local fire departments had been alerted to respond to threats to private property along Park boundaries, including Gatlinburg. [*Id.*]. By that time, the Fire was already escaping the Park and was impacting Park neighbors and local residents. [Nat'l Park Service Report, Doc. 1-5 at 35 (stating that around noon, the Park staff told Gatlinburg City officials that "the fire is coming out of the park."); Kloster Dep., Doc. 293-4 at 51 (explaining that prior to the noon meeting, "smoke had engulfed the city.").].

Throughout the rest of the day, Park Staff worked jointly with the City of Gatlinburg to fight the Fire and notify the public of additional Fire updates. [Salansky Dep., Doc. 293-1 at 270–71]. However, the Fire, which was the largest in the Park's history, left the Park's boundaries, burned the surrounding areas, and led to tragic losses of life and significant property damage.

## II. SELECTED PROCEDURAL BACKGROUND

Because the procedural history of these cases is lengthy and complex, the Court summarizes only the facts most relevant to the instant motion.

Following the tragic Chimney Tops 2 Fire of 2016, the Individual Plaintiffs filed suit in six related cases under the FTCA, alleging, among other claims, that the Park negligently failed to warn the Gatlinburg community about the Fire. In a separate set of related cases, Subrogation

11

Plaintiffs filed suit, alleging essentially the same claims as the Individual Plaintiffs, including a negligence claim based on failure to warn.

The Government moved to dismiss the Individual Plaintiffs' cases for lack of subject matter jurisdiction, based on the discretionary function exception. [*See* Mot. to Dismiss, Doc. 23]. As relevant here, the Court denied the motion as to the failure to warn claims, concluding that the Fire Management Plan ("FMP") contained mandatory directives. [Mem. Op. & Order, Doc. 41 at 14–20]. Specifically, the Court found that Section 3.3.2 of the FMP imposed a non-discretionary requirement to inform the public about fire management activities that could potentially impact them, since the directive was not phrased as a conditional "if/then" statement. [*Id.* at 17–19]. The Court also found that Table 13 of the FMP imposed a mandatory requirement for Park officials to post current fire information on websites as available; inform park neighbors of wildland fires; and use an information officer or park public affairs to disseminate information. [*Id.*].

The Government then filed a renewed motion to dismiss based on the discretionary function exception. [*See* Renewed Mot. to Dismiss, Doc. 49]. Unlike the prior motion, which raised a facial challenge, the Renewed Motion presented a factual challenge to subject matter jurisdiction, asserting that Park officials complied with the mandatory directives identified by the Court. [Gov't Mem. for Renewed Mot., Doc. 49-1]. The Court found that the Government submitted sufficient evidence to demonstrate that Park officials posted current fire information on websites and used an information officer. [Mem. Op. & Order, Doc. 87 at 16–17]. However, the Government failed to meet its burden of showing that Park Officials (1) notified Park neighbors of fire management activities that had the potential to impact them, as required under Section 3.3.2, and (2) informed the public of the Fire, as required by Table 13. [*Id.* at 17–19]. Moreover, the

12

Case 3:20-cv-00149-JRG-CRW     Document 248     Filed 03/31/26     Page 12 of 25
PageID #: 9232

Court found that even if the Government's assertions were taken as true, there were a myriad of fire management activities that Park Neighbors had not been informed about. [*Id.* at 19].

Meanwhile, in the Subrogation Plaintiffs' cases, the Government raised a facial challenge to subject matter jurisdiction based on the discretionary function exception. [*Am. Reliable Ins. Co.,* No. 19-CV-00469, Doc. 34]. Consistent with the Court's decision in the Individual Plaintiffs' cases, the Court denied the Government's motion as to the failure to warn claims, finding that Section 3.3.2 and Table 13 of the FMP contained mandatory directives. [*Am. Reliable Ins. Co.*, Doc. 49 at 28].

The Court subsequently dismissed the failure to warn claims in both the Individual and Subrogation Plaintiffs' cases based on failure to satisfy the FTCA's presentment requirement, a reason unrelated to the discretionary function exception. [*See Reed*, Mem. Op. & Order, Doc. 160; *American Reliable*, Mem. Op. & Order, Doc. 116]. Both sets of Plaintiffs appealed.

In *Abbott v. United States*, 78 F.4th 887 (6th Cir. 2023), the Sixth Circuit reversed the dismissal of the Individual Plaintiffs' failure to warn claims. *Id.* at 899. The Sixth Circuit also determined that this Court should readdress the Government's discretionary function challenge. *Id.* at 901–03. Accordingly, the Sixth Circuit remanded, with directions for this Court to permit further factual development as appropriate and "1) determine, consistent with this opinion, whether Section 3.3.2 and Table 13 set forth mandatory directives; 2) if necessary, apply *Gaubert*'s second prong; and (3) readdress the government's factual challenge in light of additional facts provided by the parties." *Id.* at 903.

In the Subrogation Plaintiffs' appeal, the Sixth Circuit also vacated the dismissal of the failure to warn claims and remanded for this Court to conduct the "same analysis as set forth in *Abbott*." *See Am. Reliable Ins. Co. v. United States*, 106 F.4th 498, 516 (6th Cir. 2024).

On remand, the parties engaged in jurisdictional discovery. The Government then filed the instant motion to dismiss Plaintiffs' claims based on the discretionary function exception. [Gov't Mot., Doc. 273]. Plaintiffs filed a joint response in opposition [Pls.' Resp., Doc. 293], with the exception of Plaintiff Scott Tegler, who filed a separate response. [2] [Tegler Resp., Doc. 288]. The Government replied to Plaintiffs' responses. [Gov't Reply, Doc. 297].

Although the Government has requested oral argument [Gov't Mot., Doc. 273 at 5], the Court finds that the issues may be decided based on the parties' thorough briefing and the deposition testimony and other exhibits they have submitted. This matter is ripe for review.

## III.    LEGAL STANDARD

"Rule 12(b)(1) motions to dismiss for lack of subject-matter jurisdiction generally come in two varieties: a facial attack or a factual attack." *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990). A facial attack merely questions the sufficiency of the complaint. *Id.* When reviewing a facial attack, the court "takes the allegations in the complaint as true, which is a similar safeguard employed under 12(b)(6) motions to dismiss." *Id.* "If those allegations establish federal claims, jurisdiction exists." *Gentek Bldg. Prods. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). In contrast, if the defendant raises a factual attack on subject matter jurisdiction, "no presumptive truthfulness applies to the allegations in the complaint." *Ohio Nat'l Life Ins. Co.*, 922 F.2d at 325. The court has "wide discretion to allow affidavits, documents, and even a limited evidentiary hearing to resolve jurisdictional facts." *Id.* (citations omitted).

---

[2] Mr. Tegler's Response [Doc. 288] raises arguments consistent with those raised in the Response jointly filed by the other Plaintiffs. [Doc. 293]. For ease of reference, the Court's analysis will cite only the Plaintiffs' joint Response [Doc. 293].

14

Generally, a district court deciding a factual challenge under Rule 12(b)(1) "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). However, when jurisdictional questions implicate the merits of a plaintiff's claim, the district court should not weigh conflicting evidence and instead, should apply a summary judgment standard to any factual disputes. *Gentek Bldg. Prods.*, 491 F.3d at 330. "This provides a 'greater level of protection to the plaintiff who in truth is facing a challenge to the validity of his claim [.]'" *Id.* (citing *Garcia v. Copenhaver, Bell & Assocs.*, 104 F.3d 1256, 1261 (11th Cir. 1997)); *see also Walters v. Flint (In re Flint Water Cases)*, 482 F. Supp. 3d 601, 616 (E.D. Mich. 2020) (finding, in factual challenge to subject matter jurisdiction based on the discretionary function exception, that "[b]ecause the parties have already engaged in jurisdictional discovery, the Court will treat any disputed jurisdictional issues of fact under a standard similar to Rule 56.").

In FTCA actions, the merits of a plaintiff's claim are often intertwined with facts that are material to jurisdiction. *See Brownback v. King*, 592 U.S. 209, 217–18 (2021) (observing that "in the unique context of the FTCA, all elements of a meritorious claim are also jurisdictional."). That is the case here. Moreover, the record before the Court is well-developed, since the Parties have already engaged in an extensive period of jurisdictional discovery. Therefore, the Court finds it appropriate to afford Plaintiffs the protection of a summary judgment standard. As such, the Court will view the facts and the inferences to be drawn from those facts in the light most favorable to Plaintiffs, the non-moving party. *See* Fed. R. Civ. P. 56.

## IV. ANALYSIS

The Federal Tort Claims Act "was designed primarily to remove the sovereign immunity of the United States from suits in tort." *Levin v. United States*, 133 S. Ct. 1224, 1228 (2013)

15

(quoting *Richards v. United States*, 369 U.S. 1, 6 (1962)). Under the FTCA, citizens may sue the United States for:

> injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b). However, there are "exceptions to this broad waiver of sovereign immunity." *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 535 (1988). As relevant here, the discretionary function exception excludes from the FTCA's coverage "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The exception prevents "judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy [.]" *United States v. Gaubert*, 499 U.S. 315, 323 (1991) (quoting *United States v. S. A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984)).

Under the Supreme Court's decision in *United States v. Gaubert*, the discretionary function exception applies if the following two requirements are met: (1) the challenged act involved "an element of judgment or choice"; and (2) the judgment or choice "is of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322–23. This test is conjunctive, meaning that "[t]he government is entitled to sovereign immunity only if the complained-of actions are *both* discretionary and of the type the exception was designed to protect." *Mynatt*, 45 F.4th at 896. There is a strong presumption that when the first *Gaubert* prong is satisfied, the second prong is satisfied as well. *Gaubert*, 499 U.S. at 324 ("When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows

16

a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion.").

"If a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation." *Id.* However, if the plaintiff argues that the government agency "complied with regulatory standards, but that the determination was incorrect," the applicability of the discretionary function exception depends on *Gaubert*'s second prong. *Berkovitz*, 486 U.S. at 544–45 (explaining that when a plaintiff argues a mandatory action was done incorrectly, the applicability of the discretionary function exception "turns on whether the manner and method of determining compliance with the safety standards at issue involve agency judgment of the kind protected by the discretionary function exception.").

### A. *Gaubert*'s First Prong

"In deciding whether the complained of conduct was grounded in judgment or choice, the crucial first step is to determine exactly what conduct is at issue." *Rosebush v. United States*, 119 F.3d 438, 441 (6th Cir. 1997). Here, the conduct at issue is Park Officials' failure to take any action to warn local officials or residents (i.e. "Park Neighbors") of the potential danger from the Fire until Monday, November 28, 2016, when the Fire was already impacting the City. Plaintiffs argue that Section 3.3.2 and Table 13 of the Fire Management Plan required Park Officials to provide this notice. However, the Government maintains that the Park complied with those provisions, to the extent they represented mandatory directives.

### 1. Section 3.3.2

Section 3.3.2 of the Fire Management Plan provides, in relevant part:

Park neighbors, Park visitors and local residents will be notified of all planned and unplanned fire management activities that have the potential to impact them.

[FMP, Doc. 23-17 at 29]. As the Sixth Circuit explained in *Abbott*, Section 3.3.2 is not necessarily mandatory. Rather, it requires the Park to make an "antecedent assessment" of whether fire management activities have the potential to impact Park Neighbors. *Abbott*, 78 F.4th at 900–01. Only if the Park performed that assessment and determined that fire management activities had a potential to impact Park Neighbors does Section 3.3.2 become mandatory. *Id.* at 901. Accordingly, here, the Court must first consider whether Park Officials ever performed the required "antecedent assessment." Second, if the assessment was performed, the Court must determine whether Park Officials concluded that any fire management activities had the potential to impact Park Neighbors. The Government satisfies *Gaubert*'s first prong only if it performed the requisite "antecedent assessment" and concluded there was no potential impact on Park Neighbors (in which case no notice was required) or found that there *was* a potential impact and issued the required notice.

The Government argues that the Park performed the "antecedent assessment" and complied with Section 3.3.2. by issuing notifications to those likely to be affected. [Gov't Mem., Doc. 273-2 at 26]. Specifically, the Government contends that between Wednesday, November 23 and Sunday, November 27, Park officials determined that only park visitors would be affected. [*Id.*]. And consistent with that assessment, the Park posted signage and issued press releases, notifying potential visitors about trails closed because of the Fire. [*Id.* at 26, 31]. According to the Government, it was not until 11:35 a.m. on Monday, November 28, when the Fire had spotted to within 1.4 miles of the Park boundary, that Park officials recognized that the Fire could spread into Gatlinburg. [*Id.* at 32]. Then, the Government argues, Park officials promptly issued additional notifications and worked with local officials to notify the citizens of Gatlinburg of the approaching Fire. [*Id.* at 27].

18

In response, Plaintiffs raise two, somewhat contradictory, arguments. First, Plaintiffs assert that the requisite "antecedent assessment" was not performed because prior to November 28, Salansky focused solely on the Fire's current impact on the Park, without considering the potential impact to Gatlinburg. [Pls.' Resp., Doc. 293 at 33]. In support of this argument, Plaintiffs highlight statements from Salansky's deposition testimony in which he indicates that he was focusing all of his energies on the Park and Park visitors during the first five days of the Fire. [*Id.* at 33–34]. Alternatively, Plaintiffs contend that Salansky knew that the Fire posed a potential risk to Gatlinburg well before Monday, but failed to take appropriate action, possibly from ignorance of the Fire Management Plan. [*Id.* at 36]. They assert that given the Near Term Fire Report from November 26, which projected that the Fire could escape containment, the high winds forecast for Monday, and other information available to Salansky, the Fire's potential danger to Gatlinburg was "obvious." [*Id.*].

The Court finds that Park Officials performed the "antecedent assessment" required under Section 3.3.2. The record shows that from November 23 to November 28, Park officials consistently assessed the Fire's potential impact. It was Salansky's initial judgment, as well as Jordan's, that there was no potential for the Fire to leave the Park. [Salansky Dep., Doc. 293-1 at 57; Jordan Dep., Doc. 293-2 at 119–120]. Although incorrect, that assessment was based on objective factors such as the current behavior of the Fire, fuel types, topography, and current weather. [Salansky Dep., Doc. 293-1 at 34]. Plaintiffs make much of Salansky's testimony, stating that prior to Monday, he focused his efforts solely on the Park. But Salansky's testimony makes clear that prior to Monday, he focused his energies on the Park because, in his professional opinion, there was no potential danger to Gatlinburg.

Moreover, the Government has shown that Park Officials complied with Section 3.3.2, to the extent it presented a mandatory requirement. During the first five days of the Fire, Park Officials were not required to notify Park Neighbors about fire management activities. This is because Park Officials had not yet determined that there was a potential for fire management activities to impact the community. Section 3.3.2's notice requirement became mandatory on Monday, when Salansky and other Park Officials recognized that the Fire could spread into Gatlinburg. However, at that point, Park officials complied with Section 3.3.2 by notifying Park Neighbors through media releases and meetings with local officials.

### 2. Table 13

Table 13, which is located in Section 4.4 of the Fire Management Plan, "outlines mitigation actions *required* to protect values at risk and to ensure the safety of park staff and visitors as well as the neighboring public." [FMP, Doc. 273-17 at 56] (emphasis added). As relevant here, one of the mitigation actions required for protection of the neighboring public is to "[i]nform park neighbors of wildland fires." [FMP, Doc. 273-17 at 56]. This is a mandatory directive, which would be violated if Park Officials failed to provide the Gatlinburg community with *any* notice regarding the Fire. *See Abbott*, 78 F.4th at 902 (finding that Plaintiffs' allegation that the Park "failed to provide *any* notice" implicated a non-discretionary duty under Table 13).

In its Renewed Motion to Dismiss, the Government argued that Park Officials complied with the requirement to inform Park Neighbors about the Fire. [Gov't. Mem. for Renewed Mot., Doc. 49-1 at 9]. In support of this argument, the Government relied on a declaration from the Park's Management Assistant Dana Soehn, along with copies of the press releases, postings to the Park webpage, and social media posts she released. [*See* Soehn Decl., Doc. 49-3]. The Government also provided a declaration from Warren Bielenberg, who served as a public information officer

at the Park on Sunday, November 27 and Monday, November 28, as well as images of Fire-related signage at the Park. [*See* Bielenberg Decl., Doc. 49-4]. The Court found this evidence insufficient because the Government did not provide evidence regarding where the media releases were sent. [Mem. Op. & Order, Doc. 87 at 18]. Further, the Government claimed Park Leadership communicated with Gatlinburg officials on November 28, but failed to provide any testimony from those individuals. [*Id.*].

In the instant motion, the Government asserts that it has now provided the evidence the Court previously found to be lacking. [Gov't Mem., Doc. 273-2 at 45–46]. The new evidence the Government relies on includes a Press Release Distribution List [Gov't Att. 27, Doc. 273-35], a record of Media Impressions from November 28th [Gov't Att. 33, Doc. 273-41], a Media Timeline, created by Gatlinburg Public Relations Manager Marci Claude [Gov't Att. 37, Doc. 73-45], and deposition testimony from Claude, Jordan, Salansky, and Soehn [Docs. 293-1–293-3; 293-7].

Plaintiffs assert that the Government has not provided any new evidence that it complied with Table 13. [Pls.' Resp., Doc. 293 at 42]. In their view, "the Government's motion merely rehashes the same press releases, internal Park signage, and social media posts that this Court previously found insufficient." [*Id.*]. Further, Plaintiffs contend that the Government "fail[s] to identify anyone in Gatlinburg who received any of these notifications, other than Marci Claude, who was not responsible for disseminating emergency information to City officials." [*Id.*].

Contrary to Plaintiffs' assertion, the Government's new evidence shows that the Park complied with its obligation to inform Park Neighbors of the Fire. The Press Release Distribution List details which local media outlets, local officials, local tourism boards, and park staff were sent the press releases. [Gov't Att. 27, Doc. 273-35]. The record of Media Impressions shows that on November 28, starting around 11:00 a.m., local news stations began reporting on the Fire. [Gov't

21

Att. 33, Doc. 273-41]. And deposition testimony establishes that Park officials communicated with Gatlinburg officials about the Fire starting around 11:00 a.m. on November 28. [*See* Salansky Dep., Doc. 293-3 at 250–51; Jordan Dep., 293-2 at 289–93; Soehn Dep., Doc. 293-6 at 225–30]. Although the Government has not identified individual citizens who received the Park's press releases, Table 13 affords Park Officials discretion in deciding how to disseminate information about wildfires to the public. The fact that many citizens in Gatlinburg may not have been aware of the Park's press releases goes to the question of whether notice was effective, not whether notice was given. Therefore, the mandatory aspect of Table 13's requirement to "[i]nform park neighbors of wildland fires" was satisfied.

### B. *Gaubert*'s Second Prong

To the extent Plaintiffs challenge the accuracy of Park Officials' assessments of the Fire or the timing and manner in which notice of the Fire was given, their claims implicate discretionary conduct that must be analyzed under *Gaubert*'s second prong. Discretionary conduct is protected under *Gaubert* if it is "grounded in social, economic, and political policy." *Gaubert*, 499 U.S. at 323. "Stated another way, if there is a reason for the conduct to require a balancing of interests, it falls within the exception." *Mynatt*, 45 F.4th at 898. This is an objective inquiry. The Court considers "whether the challenged actions are 'susceptible to policy analysis,' not whether they were the result of a policy analysis." *Rosebush*, 119 F.3d at 444 (citation omitted).

The Government argues that the conduct Plaintiffs complain of was the kind of conduct the discretionary function exception was designed to shield. [Gov't Mem., Doc. 273-2 at 48]. They assert that "[q]uestions about whether, when, and how to raise public alarm inherently involve policy-laden judgments[.]" [*Id.*]. The Court agrees. The Sixth Circuit has recognized that generally, "the decision whether to warn of potential danger is a protected discretionary function."

22

*Id.* at 443. Here, the Fire Management Plan authorized Park Officials to use discretion in assessing the Fire's danger and issuing warnings to the public. Because Park Officials were exercising discretion authorized under the agency regulations even an abuse of that discretion is protected. *See* 28 U.S.C. § 2680(a) (providing that the Government's sovereign immunity is not waived when the plaintiff's claim is based on "the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, *whether or not the discretion involved be abused.*") (emphasis added).

Plaintiffs cite several reasons why they believe that the Park's failure to give timely and adequate notice of the Fire is not subject to policy analysis. However, these arguments fail.

First, Plaintiffs contend that the notice required under Section 3.3.2 and Table 13 was the product of prior policy judgments and Park officials did not have discretion to disregard them. [Pls.' Resp., Doc. 293 at 43–44; 49–50]. In making this argument, Plaintiffs cite *Myers v. United States*, 17 F.3d 890 (6th Cir. 1994). There, the Sixth Circuit found that MSHA inspectors' failure to detect lethal concentrations of gas in a mine was not subject to policy analysis. *Id.* at 898. In reaching that conclusion, the Sixth Circuit reasoned that consideration of the most effective use of agency resources had already been decided by Congress and the Department of Labor. *Id.* Significantly, the safety inspection at issue in *Myers* was subject to detailed agency regulations and involved a task that was essentially ministerial. Unlike in *Myers*, Park Officials' assessment of the Fire's potential danger and whether warnings should be issued, involved the use of judgment.

Second, Plaintiffs contend that the Government identifies no policy considerations that informed its failure to warn. [*Id.* at 44–45]. However, the Government did cite a policy concern—the concern over when the Fire presented a significant enough danger to raise public

alarm. And even if the Government's cited policy reason is somewhat general, the Government does not have the burden of showing that agency conduct was grounded in a legitimate policy concern. [3] *See A.O. Smith Corp. v. United States*, 774 F.3d 359, 370 (6th Cir. 2014) ("[A]lthough the government has not suggested an actual policy basis for its failure to warn, the burden is not on the government to do so.").

Next, Plaintiffs argue that the Park's failure to warn is not protected because it was the result of operational failures, not the exercise of policy judgment. [*Id.* at 45–49]. However, under *Gaubert*'s second prong, the proper inquiry is whether the challenged actions are "susceptible to policy analysis," not whether they were the result of a policy analysis. *Rosebush*, 119 F.3d at 444. Even if Park Officials made mistakes while responding to the Fire, the decisions that they were called upon to make involved the balancing of interests and fall within the discretionary function exception.

Finally, Plaintiffs argue that failure to warn of a known danger is not susceptible to policy analysis. [*Id.* at 49–50]. However, the Sixth Circuit has not taken that view. *Id.* at 443 ("[T]he decision whether to warn of potential danger is a protected discretionary function."); *see also Sharp ex rel Est. of Sharp v. United States*, 401 F.3d 440, 445 (6th Cir. 2005) (recognizing that the discretionary function exception generally bars "the proper response to hazards" and "whether to warn of potential dangers").

## V. CONCLUSION

In sum, the evidence shows that Park Officials performed the mandatory conduct required by Section 3.3.2 and Table 13 of the Fire Management Plan. The Park's decisions regarding when

---

[3] The Court notes that the expansive deference afforded the Government under *Gaubert*'s second prong is not immune from valid criticism. *See, e.g.* IMMUNITY FOR IMAGINARY POLICY IN TORT CLAIMS AGAINST THE FEDERAL GOVERNMENT, 100 Notre Dame L. Rev. 729, 735 (2025) ("The courts should not be asked to defer to the clever imaginings of government lawyers who postulate a hypothetical policy choice that was never made.").

24

and how to warn the public about the Fire, while far from perfect, represented the kind of judgment calls that are protected under the discretionary function exception. Hence, the Court **GRANTS** the Government's motion to dismiss for lack of subject matter jurisdiction in the Individual and Subrogation Plaintiffs' cases:

Doc. 273, *Reed et.al. v. United States,* No. 3:18-CV-00201;

Doc. 245, *Anculle et al. v. United States,* No. 3:18-CV-00308;

Doc. 246, *Adkins et al. v. United States,* No. 3:18-CV-00310;

Doc. 224, *Vance et. al., v. United States,* No. 3:19-CV-00283;

Doc. 221, *Barnes et. al. v. United States,* No. 3:19-CV-00296;

Doc. 208, *Abbott et al. v. United States,* No. 3:20-CV-00149;

Doc. 225, *American Reliable Ins. Co. v. United States*, No. 3:19-CV-00469;

Doc. 209, *Allstate Ins. Co. v. United States*, No. 3:19-CV-00474;

Doc. 232, *State Farm v. United States*, No. 3:19-CV-00470

Doc. 209, *USAA v. United States*, No. 3:19-CV-00472

Doc. 231, *Auto Owners Ins. Co. v. United States*, No. 3:19-CV-00478.


So ordered.

ENTER:


s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE

25